UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
American Cargo Transport, Inc.          )
                                        )
              Plaintiff,           )
                                        )
v.                                      )
                                        )   C.A. No.
                                        )
The Honorable Andrew S. Natsios         )
   Administrator United States Agency  )
    for International Development     )
    et als.                           )
                                        )
              Defendants.          )
                                        )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND FOR PRELIMINARY INJUNCTION**

      Pursuant to Rule 65, Fed. R. Civ. P., Plaintiff American Cargo Transport Inc., owners of the U.S.-flag vessel THUNDER / LIGHTNING ("Vessel"), seek a temporary restraining order and preliminary injunction enjoining Defendant United States Agency for international Developoment ("USAID") from flouting their obligation to use U.S.-flag vessels for ocean transportation services for cargoes which are substantially reserved for U.S.-flag vessels. Defendant's avoidance of its obligations to use U.S.-flag vessels will threaten Plaintiff with irreparable harm because the cargoe will be lost to the U.S.-flag and its Vessel will remain unemployed.

      This case fully satisfies the standards governing injunctive relief set out in <u>Virginia Petroleum Jobbers Ass'n</u> v. <u>FPC</u>, 259 F.2d 921 (D.C. Cir. 1958) and

1

<u>Washington Metropolitan Area Transit Commission</u> v. <u>Holiday Tours, Inc.</u>, 559 F.2d 841 (D.C. Cir. 1977).

**I.    Background**

**Parties**

Plaintiff ACT owns and operates three U.S.-flag vessels. The THUNDER / LIGHTNING is an integrated tug barge well suited to the carriage of breakbulk cargoes and containers.

USAID administers a humanitarian aid program under Title II of the agricultural Agricultural Trade Development and Assistance Act of 1954, 7 U.S.C. § 1721 <u>et seq.</u>, ("Title II") which provides for donations or grants of agricultural commodities to foreign donees for relief and for economic development through private or public agencies, usually non-profit agencies called private volunteer organizations ("PVO").

Maritime Administration ("Marad"), United States Department of Transportation, administers programs intended to promote the U.S. merchant marine, including the cargo preference program. Marad reports to Congress on an annual basis with respect to the cargo preference program. Marad keeps a running year-to-date total of the U.S.-flag and foreign-flag participation by vessel type by country for the Title II program and each of the other programs covered by cargo preference.

**Programs**

In these programs, USAID or a participating private voluntary organizations ("PVO's") like CARE, through an appointed freight forwarder, solicits ocean freight offers with rate quotations on parcels of various sizes moving from various U.S. ports to designated foreign destination ports. The tenders usually seek offers for U.S.-flag and

foreign-flag vessels. After the offers are received, USAID decides how to assign the parcels between U.S. and foreign-flag vessels and so instructs the PVO's and their agents.

One of the primary programs to assist U.S.-flag vessels is the Cargo Preference Act of 1954, 46 U.S.C. app. § 1241(b) which requires that whenever the United States grants materials or commodities, the administering agencies must assure that "at least" 50% of the gross tonnage of such commodities computed separately for dry bulk carriers, dry cargo liners, and tankers transported on ocean vessels shall be transported on U.S.-flag commercial vessels for each geographical area[1]. Agricultural commodities are covered by a 75% U.S.-flag requirement owing to a further obligation that an additional "25 percent of the gross tonnage of agricultural commodities or the products thereof … shall be transported on United States-flag commercial vessels" under Title XI of the Food Security Act of 1985, Pub. L. 99-198, 46 U.S.C. App. 1241f. Commodities sponsored under the Title II program are covered by the 75% US flag participation requirement of the Food Security Act of 1985.

"Every department or agency" having responsibility under the Cargo Preference Act of 1954 and the Food Security Act of 1985 is required to administer its cargo preference program under regulations issued by Marad. 46 U.S.C. app. 1241(b)(2). Marad was also given authority to report to Congress with respect to the administration

---

[1] Section 1241(b) provides in relevant part:
>    [w]henever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any equipment, materials, or commodities, within or without the United States, or shall advance
>    funds or credits or guarantee the convertibility of foreign currencies in connection with the furnishing of such equipment, materials, or commodities, the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such equipment, materials or commodities (computed separately for dry bulk carriers, dry cargo liners, and tankers), which may be vessels are available at fair and reasonable rates for United States-flag commercial vessels, to the extend such vessels are available at fair and reasonable rates for United States-flag commercial vessels in such cargoes by geographical areas …

of cargo preference by governmental agencies. Marad was given this role in 1970 to assure consistent, sympathetic implementation of the Cargo Preference Act. The Senate Commerce Committee Report on the bill that became Pub. L. 91-469 at Section 27 noted:

> Although the cargo preference program is generally recognized as an important pillar of our maritime policy, its administration has tended to be uneven and chaotic. A lack of uniform and rational administration has worked to the disadvantage of shippers, carriers, and various geographic areas of our nation and has made it exceedingly difficult to assess and review the overall impact of the program.

S. Rep. No. 1080, 91st Cong., 2nd Session. 19, 58 (1970) reprinted at 1970 U.S. Code and Adm. News 4188, 493, 4232. The Conference Committee declared:

> In the absence of [centralized] control, the various Agencies charged with administration of cargo preference laws have adopted varying practices and policies, many of which are not American shipping oriented. Since these laws were designed by Congress to benefit American shipping, they should be administered to provide maximum benefits to the American merchant marine.

Id. at 4260, 4262-63.

When a dispute arose between Marad and other agencies regarding Marad's authority to prescribe standard charter terms for shipper agencies, the Department of Justice determined that Marad had such authority. The Office of Legal Counsel, Department of Justice declared, "[t]he legislative history confirms that Congress intended [Marad] to have substantial authority and leeway in imposing a degree of uniformity upon other departments and agencies in the administration of their cargo preference programs." See April 19, 1994 Memorandum from Walter Dillinger, Assistant Attorney General to Stephen H. Kaplan, General Counsel, and Department of Transportation.

Marad's statutory mandate to assure reasonable participation of U.S.-flag vessels by geographical area has been judicially construed to mean by destination so that "the government can't short-haul domestic carriers" by allocating short voyages to U.S.-flag vessels but long voyages to foreign vessels. City of Milwaukee v. Yeutter, 877 F.2d. 540, 543 (7th Cir. 1989) cert. denied 493 U.S. 976. In fact USAID has agreed to a consent decree to "measure compliance with the requirements of the cargo preference laws with respect to the Food for Progress and Section 416(b) program on a country-by-country basis to the extent practicable … " Farrell Lines Incorporated v. United States Department of Agriculture, D.D.C. C.A. No. 98-2046 (filed September 19, 1998).

Similarly, Marad rules specify that the U.S.-flag/foreign percentage shall be allocated by "grant, loan, or purchase transaction." 46 C.F.R. §381.4. Marad also advised USAID that

> the purchase transaction (individual commodity tender) is the appropriate unit of measurement (calculated by vessel type) for ensuring that 75 percent of the packaged commodities are fixed on U.S.-flag vessel.

See June 29, 1998 Letter from Marad Associate Administrator James J. Zok to USAID Deputy Administrator Vicki J. Hicks and AID Deputy Administrator Leonard Rogers. Accordingly, USAID is obliged to meet and maintain the 75% U.S.-flag requirement throughout each year on a country-by-country basis. The Civil Division of the Department of Justice has advised USAID that it is mandated to comply with the Cargo Preference Act in such manner as will insure a fair and reasonable participation of US flag vessels by geographic areas. *Victory Maritime Inc. v. Presseley*, CA No. 01-0381 (DDC filed February 16, 2001).

In the case of a "full shipload of cargo" subject to cargo preference, each department or agency "shall cause" such cargo to be fixed on U.S.-flag vessels prior to any fixture on foreign flag vessels. See 46 C.F.R. §381.5.

**II.    Agency Actions Complained of**

In Invitation No. 075 dated July 11, 2005 offers for ocean carriage for approximately 2009 metric tons of sorghum in 50 kilogram bags moving under Title II from Dubai, U.A.E., to Mombasa, Kenya, were solicited by brokers of behalf of a PVO, CARE. The tender, which was described as "urgent," required offers to be submitted by fax to Care's agent's offices by 1100 hours on July 13, 2005. See Declaration of O. Ahmad at Para. 2

On July 13, 2005, ACT through its broker submitted a timely, responsive offer for service by its U.S.-flag vessel, the THUNDER / LIGHTNING, to carry the bagged sorghum cargo in accordance with the terms of the tender. This vessel is an integrated tug barge that is well suited to carrying of such cargo. *Id.* at Para. 3.

On July 13, 2005 and through the date of this submission the Vessel was in Dubai and available to load cargo immediately and sail directly to the discharge port. *Id.* Although ordinarily, USAID acts on urgent offers for tenders within two business days, the agency did nothing with the offers for seven days. On or about July 19, 2009, USAID made a decision to assign the bagged sorghum to a foreign vessel with a schedule that provided an estimated time of arrival *later* that ACT's Vessel. *Id.* at Para. 5.

On or about July 20, 2005 ACT learned that the cargo had been assigned tentatively to a foreign flag vessel with later delivery schedule than the Vessel. Specifically, the Vessel was scheduled to deliver the cargo by direct sailing within nine days from loading. The foreign vessel awarded the cargo maintained a schedule that would provide for discharge in 12 to 14 days. *Id.* at Para. 7.

      ACT, through its broker, and later through its counsel protested the decision to USAID orally and in writing without success. ACT also applies to Marad for assistance with USAID. Marad too protested the action to USAID and advised USAID that it was out of compliance with the Cargo Preference Act. *Id*. at Para. 8.

      The Vessel is considered to be a liner vessel by Marad. The US flag liner participation for the Title II program for cargo to Somalia is reported to be 69.4% by Marad; the U.S. -flag percentage participation in the Title II program for the current year is approximately 64.9%, both measurably below the required 75%. Award to a foreign vessel at this time would reduce US flag participation to Somalia to 57.6%. Further, the cargo preference accounting year, which runs from October 1 to September 30, is nearing its end so the amount of time available to correct deficits is running short. *Id*. at Para. 10.

      The THUNDER/LIGHTNING remains unemployed in the port at Dubai as of this writing. It is available to carry the cargo and discharge it sooner than the foreign vessel engaged by USAID. It has been unemployed for more than two weeks. ACT will soon be required to make decisions as to how and where to position the vessel for this cargo or perhaps to lay off the crew by reason of the failure of Defendant USAID to meet the required minimum participation for U.S.-flag vessels under Title II. Thereafter, the crew will be discharged and the vessel will remain idle until such time as it can be suitably employed. *Id*.

**III.    Discussion**

The factors applied in considering a temporary restraining order are: (1) likelihood that the party seeking the stay will prevail on the merits; (2) likelihood that the plaintiff will be irreparably harmed; (3) the likelihood of harm to others if the order is granted; and (4) the public interest in grant of an order.  See <u>Virginia Petroleum Jobbers Ass'n</u> v. <u>FPC</u> supra.; <u>Washington Metropolitan Area Transit Comm'n</u> v. <u>Holiday Tours, Inc.</u>, supra.  This inquiry is a balancing of the factors.  Nevertheless, "[t]he basis for injunctive relief in federal courts has always been irreparable harm and inadequacy of legal remedies," <u>Sampson</u> v. <u>Murray</u>, 415 U.S. 61, 88 (1974).  See also <u>Wisconsin Gas</u> v. <u>F.E.R.C.</u>, 7758 F.2d 669, 674 (D.C. Cir. 1985).  An applicant for injunctive relief challenging an agency decision as contrary to law or rule need only establish that chances of success are reasonable.  See <u>United Power Corp.</u> v. <u>United States Defense Mapping Agency</u>, 736 F. Supp. 354, 357 (D.D.C. 1990); <u>Ace-Federal Reporters, Inc. v. FERC</u>, 732 F. Supp. 10, 11 (DDC 1990) ( where plaintiff raised "substantial concerns" concerning agency actions the substantial likelihood of success satisfied)..  As demonstrated below, this case falls well within the standards for grant of a temporary restraining order and a preliminary injunction.

There is no doubt that this court has jurisdiction to hear this dispute in as much as it constitutes an ordinary administrative decision. This District Court found jurisdiction to hear a challenge seeking injunctive relief as to an award under Title II. See <u>American President Lines, Ltd. v. United States Agency for International Development</u>, DDC C.A. 02-01878 (October 11, 2002) ("Thus the court may properly review USAID's actions pursuant to its own regulations, 22 C.F.R. § 211 et seq., along with the

subsequently–issued Booking Guidelines.")

### A.  Plaintiff is Likely to Prevail on the Merits

The rules for administration of this program are well defined. USAID has agreed in a consent order in this court to measure compliance with the requirements of the cargo preference laws with respect to the Section 416(b) and Food for Progress on a country-by-country basis. See Farrell Lines Incorporated v. United States Department of Agriculture, D.D.C., C.A. No. 98-2046 (filed September 19, 1998). Likewise, Title II must be administered "in such a manner as will insure a fair and reasonable participation of United States–flag commercial vessels … by geographic areas." 46 U.S.C. § 1241 (b)(1), which means country-by-country. Accordingly, USAID must ship 75% of the commodities destined for Somalia under these programs on U.S.-flag vessels.

As of July 2005 USAID has assigned only 69% of Title II liner cargo on US flag vessels and although the percentage to Somalia is currently 82% the assignment of the sorghum under Invitation No. 075 to the foreign vesssel to U.S.-flag vessels will reduce the percentage to 57%. The overall percentage of US flag participation in the Title II program for this year is 62% well below the required 75%.

It would not be sufficient for USAID to resist this claim by declaring its intention to make up the deficit with cargoes moving later in the program year. The program year is approaching its end. The Marad rules are intended to assure that the U.S.-flag participation is maintained and avoid bunching opportunities at the end of the program year.

### B.  Plaintiff will be Irreparably Harmed in All Likelihood

If the 4930 MT of vegetable oil cargoes moving to India under Invitation 025 are

9

permitted to go entirely on foreign vessels, the cargo will be lost to the American merchant marine and to ACT's vessel in particular. Plaintiff will have no remedy at law with respect to the lost cargo. The THUNDER / LIGHTNING will remain unemployed so it will be laid up and the crew laid off until further employment can be found.

### C. No Harm Will be Worked by Entry of a Temporary Restraining Order and Preliminary Injunction

The cargo apparently has been booked tentatively with a foreign carriers but the decision to book the cargo in the face of ACT's protest letter certainly put USAID on notice that it may be required to obey the applicable legal requirement to use U.S.-flag vessels. The Vessel is prepared to lift the vegetable oil to India on the loading dates set out in Invitation 025. See Declaration of Obaid Ahmad.

### D. The Public Interest will be Served by Entry of an Injunction

Plaintiff have endeavored to encourage Defendant USAID to acknowledge their obligation to ship 75% of the dry cargo tonnage to India on U.S.-flag vessels. Allocation of this cargo to U.S.-flag liner vessels is nothing more than a fair application of the terms of the statute and the rules. Judicial enforcement of this basic obligation therefore is appropriate.

Plaintiff does not seek any relief which will prevent relief cargoes from reaching their intended destination in a timely manner wholly consistent with the terms of Invitation 075.

**Conclusion**

Defendants USAID have blatantly ignored their obligation to meet the 75% for cargoes destined for India in the Title II program. Irreparable harm to Plaintiff in the form of lost cargo and downtime and otential layup of the Vessel is manifest. Public

policy considerations favor enforcement of these clear statutory mandates. Where an agency has so demonstrably fallen short of statutory mandates, injured parties need only a modest showing of harm and public policy considerations to warrant relief. General Electric Co. v. Seamans, 340 F. Supp. 636, 639 (D.D.C. 1972); Baird Corp. v. Marsh, 579 F. Supp. 1158, 1161 (D.D.C. 1983); see also Mark Dunning Industries, Inc. v. Perry, 890 F. Supp. 1504, 1518 (M.D. Al. 1995) (conformance with federal statutes and regulations "will best serve the public interest").

A proposed order is submitted herewith.

Respectfully submitted,


Timothy B. Shea    DC Bar #234005
Nemirow Hu & Shea
1629 K Street, NW; #600
Washington, DC  20036
(202) 835-0300

Attorneys for American Cargo Transport Inc..