# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AMERICA CARGO                           )
TRANSPORT, INC.                         )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        Civil Action No.: 05-1452 (RBW)
                                        )
ANDEW S. NATSIOS,                       )
U.S. AGENCY FOR INTERNATIONAL           )
DEVELOPMENT,                            )
and JOHN JAMIAN, ACTING                 )
MARITIME ADMINISTRATOR,                 )
DEPARTMENT OF TRANSPORTATION, )
                                        )
        Defendants.                     )
_____)


## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


Pursuant to Rule 56 Fed. R. Civ. P. and Local Civil Rule 7(h), Plaintiff, America

Cargo Transport, Inc., ("ACT") hereby moves for summary judgment.

ACT, the owner and operator of US-flag vessels operating in the US foreign

commerce, challenges as arbitrary and capricious a decision by the United States Agency

for International Development ("USAID"), after publication of a tender for ocean

transportation, to invoke certain emergency authorities in order to alter the existing

requirement to use US-flag vessels. In July of 2005 ACT applied for a temporary

restraining order and preliminary injunction prohibiting use of foreign vessels in this

movement. After a hearing, this Court denied the application. The cargo later was loaded on a foreign flag vessel for movement to its destination port.

The Government has filed an administrative record from the defendant agencies.

ACT has a number of vessels that rely regularly on the carriage of cargo under tenders for freight offers issued by USAID like the one in question. Indeed, the vessel offered for this movement remained in East Africa for several months precisely to carry such cargoes and military cargoes originating in that area.

In this case, the specific tender inviting offers for ocean carriage included a standard notation that preference for US-flag vessels would apply to the movement in accordance with guidance from the Maritime Administration ("Marad"). ("Cargo Preference compliance will be in accord with the Maritime Administration's January 8, 2003 letter." Administrative Record ["AR"] at 013). After receipt of bids from ACT and other US and foreign carriers in response to the tender, USAID determined that the ACT's US-flag rates -- the best of the US offers -- were "exorbitant" and, thereafter, prepared a memorandum of findings and determinations intended to support the use of extraordinary authorities to avoid application of the preference for US-flag. Importantly, no amendment of the original tender was made nor did USAID receive any further information or instructions from the shipper contracting for the carriage, CARE, setting out any altered logistical requirements for the cargo after issuance of the tender.

USAID's rationale for the determination was manifestly wrong.

First, ACT's freight rate was fair and reasonable and determined to be so by Marad based on a calculation in the record using established rules, actual vessel data and actual port data. AR at 0101, 0102. No numbers or data were used to support the USAID

conclusion beyond the naked comparison with the foreign rates. Marad's application of the specific statutory authority, implementing rules and vessel specific data to determine the reasonableness of US -flag freight rates must prevail over USAID's subjective, dead reckoning guess.

Second, USAID asserted that it intended to save money for use in the Title II program year by a using a cheaper foreign flag vessel. Yet, USAID never acknowledged in its memorandum that it will receive reimbursement of 95% of the ocean freight differential -- the additional cost of the US over foreign vessel -- from Marad promptly after payment of ocean freight. USAID ignored Marad's reminder that "AID is reimbursed for the rate differential." AR 091. Moreover, this particular expenditure was part of grant agreement with CARE for a fixed amount spanning fiscal years 2005 and 2006. The amount of the grant to CARE, having been budgeted in April 2005, remained unchanged for the fiscal year 2005 notwithstanding any "savings" achieved by the use of foreign vessels. Savings against the grant budget would not be recognized until the end of the grant well into 2006 and well after receipt of the Marad reimbursement.

Third, although USAID is required to use US-flag vessels for at least 75% of the program tonnage, the USAID determination *never* considered that it was behind in its obligation to use US -flag vessels for the current Title II year by substantial amounts with less than two months remaining in the program year. In fact, USAID had accrued a deficit in the US -flag tonnage of over 250,000 tons for the Title II program as a whole. Predictably, the Title II program ended the year with a substantial deficit for the US-flag.

Fourth, the determination itself was irregular. The signer of the determination memorandum lacked the authority to waive application of cargo preference. Also,

rejection of ACT's vessel, which offered the earliest delivery date of any vessel, was at odds with the "urgent" terms of the tender and nothing short of disingenuous.

In short, the USAID decision was based on a combination of dead reckoning of rates and willful ignorance of patent programmatic considerations. For these reasons, the determination seeking to waive application of cargo preference was manifestly arbitrary and capricious and must be set aside.

A Statement of Material Facts as to Which There is No Genuine Issue, a Memorandum of Points and Authorities and proposed order are submitted herewith.

Respectfully submitted,

Timothy B. Shea

DC Bar No. 234005
Nemirow Hu & Shea
1629 K Street, NW Suite 500
Washington, DC 20036
202 835 0300

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| AMERICA CARGO | ) |
| TRANSPORT, INC. | ) |
|  | ) |
|     Plaintiff, | ) |
|  | ) |
|     v. | ) |
|  | ) |
| ANDEW S. NATSIOS, | ) |
| U.S. AGENCY FOR INTERNATIONAL | ) |
| DEVELOPMENT, | ) |
| and JOHN JAMIAN, ACTING | ) |
| MARITIME ADMINISTRATOR, | ) |
| DEPARTMENT OF TRANSPORTATION, | ) |
|  | ) |
|     Defendants. | ) |

Civil Action No.: 05-1452 (RBW)

_____)

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In this action Plaintiff, America Cargo Transport, Inc., owner of US-flag vessels operating in the foreign commerce of the United States, demonstrates that the decision of the defendant United States Agency for International Development ("USAID"), after reviewing offers, to convert a tender for ocean transportation services from one for which preference for US-flag vessels applied to one for which the preference did not apply was arbitrary, capricious and not in accordance with law. After USAID saw the rates offered by ACT and other US-flag carriers in response to the tender, USAID made an administrative finding that the rates were so "exorbitant" that it wished to resort to other emergency authorities to justify waiver of the US-flag requirement for this long planned non-emergency movement. The basis for the decision was manifestly wrong: the rate offered was reasonable and found

1

to be so by the Maritime Administration ("Marad"); USAID never acknowledged that most

of the extra costs for US-flag carriage would be reimbursed to USAID by Marad; USAID

never considered that the Title II program was well behind in US-flag tonnage for the

accounting year and, indeed, was certain to fall short of the required percentage; and the

waiver itself was irregular.

I.      **Background**

        A. **Cargo Preference and USAID Programs.** USAID administers, inter alia, the

Agricultural Trade Development and Assistance Act of 1954, 7 U.S.C. § 1721 et seq.,

("Title II") and the arrangement of ocean transportation for certain grant or aid cargoes

consistent with the requirements of Title II. Marad, a modal unit of the Department of

Transportation, is charged with promoting the United States merchant marine and

administration of the Cargo Preference Act of 1954, 46 U.S.C. app. § 1241(b) ("Cargo

Preference Act").

        One of the primary programs to assist U.S.-flag vessels, the Cargo Preference Act

requires that whenever the United States grants materials or commodities for the benefit

of another country, the administering agencies must assure that "at least" 50% of the

gross tonnage of such commodities "computed separately for dry bulk carriers, dry cargo

liners, and tankers" transported on ocean vessels shall be transported on U.S.-flag

commercial vessels for each geographical area.[1]  For agricultural commodities at least

---

[1] Section 1241(b) provides in relevant part:
> [w]henever the United States shall procure, contract for, or otherwise obtain for its own account,
> or shall furnish to or for the account of any foreign nation without provision for reimbursement,
> any equipment, materials, or commodities, within or without the United States, or shall advance
> funds or credits or guarantee the convertibility of foreign currencies in connection with the
> furnishing of such equipment, materials, or commodities, the appropriate agency or agencies
> shall take such steps as may be necessary and practicable to assure that at least 50 per centum of

75% of the tonnage must move on U.S.-flag vessels owing to a further obligation that an additional "25 percent of the gross tonnage of agricultural commodities or the products thereof … shall be transported on United States-flag commercial vessels" under Title XI of the Food Security Act of 1985, Pub. L. 99-198, 46 U.S.C. app. § 1241f.  Aid commodities sponsored by the United States Agriculture Department ("USDA") and USAID under the Title II program are covered by the minimum 75% US-flag participation requirement of the Food Security Act of 1985.

"Every department or agency" having responsibility under the Cargo Preference Act is required to administer its cargo preference program under regulations issued by Marad.  46 U.S.C. app. § 1241(b)(2). This role was assigned to Marad by Congress in 1970 to assure consistent, well informed implementation of the Cargo Preference Act. The Senate Commerce Committee Report on the bill that became Pub. L. 91-469 at Section 27 noted:

> Although the cargo preference program is generally recognized as an important pillar of our maritime policy, its administration has tended to be uneven and chaotic.  A lack of uniform and rational administration has worked to the disadvantage of shippers, carriers, and various geographic areas of our nation and has made it exceedingly difficult to assess and review the overall impact of the program.

S. Rep. No. 1080, 91st Cong., 2nd Session 19, 58 (1970) reprinted at 1970 *U.S. Code and Adm. News* 4188, 493, 4232.  The Conference Committee declared:

> In the absence of [centralized] control, the various Agencies charged with administration of cargo preference laws have adopted varying practices and policies, many of

---

the gross tonnage of such equipment, materials or commodities (computed separately for dry bulk carriers, dry cargo liners, and tankers), which may be vessels are available at fair and reasonable rates for United States-flag commercial vessels, to the extend such vessels are available at fair and reasonable rates for United States-flag commercial vessels in such cargoes by geographical areas …

> which are not American shipping oriented.  Since these
> laws were designed by Congress to benefit American
> shipping, they should be administered to provide maximum
> benefits to the American merchant marine.

Id. at 4260, 4262-63.

When a dispute arose between Marad and USDA regarding Marad's authority to prescribe standard charter terms for carriage of agricultural commodities under the sponsorship of shipper agencies like USDA, the Department of Justice determined that Marad had such authority.  The Office of Legal Counsel, Department of Justice declared, "[t]he legislative history confirms that Congress intended [Marad] to have substantial authority and leeway in imposing a degree of uniformity upon other departments and agencies in the administration of their cargo preference programs."  See April 19, 1994 Memorandum from Walter Dellinger, Assistant Attorney General to Stephen H. Kaplan, General Counsel, Department of Transportation ("OLC Memorandum").

Marad's statutory mandate to assure reasonable participation of U.S.-flag vessels by geographical area has been judicially construed to mean by destination so that "the government can't short-haul domestic carriers" by allocating short voyages to U.S.-flag vessels but long voyages to foreign vessels.  *City of Milwaukee v. Yeutter*, 877 F.2d 540, 543 (7th Cir. 1989) *cert. denied* 493 U.S. 976.   In fact, USDA has agreed to a consent decree to "measure compliance with the requirements of the cargo preference laws with respect to the Food for Progress and Section 416(b) program on a country-by-country basis to the extent practicable … "  *Farrell Lines Incorporated v. United States Department of Agriculture*, D.D.C. C.A. No. 98-2046 (filed September 19, 1998).

Similarly, Marad rules specify that the U.S.-flag/foreign percentage shall be allocated by "grant, loan, or purchase transaction." 46 C.F.R. § 381.4. Marad also advised USDA that

> the purchase transaction (individual commodity tender) is the appropriate unit of measurement (calculated by vessel type) for ensuring that 75 percent of the packaged commodities are fixed on U.S.-flag vessel.

See June 29, 1998 Letter from Marad Associate Administrator James J. Zok to USDA Deputy Administrator Vicki J. Hicks and AID Deputy Administrator Leonard Rogers. Accordingly, shipper agencies like USAID and USDA are obliged to meet and maintain the 75% U.S.-flag requirement throughout each year on a country-by-country basis.

Marad has a comprehensive procedure to determine the fairness and reasonableness of rates for U.S.-flag vessels set out in 46 C.F.R. § 382.1 et seq. Under the rule, US-flag operators, including ACT, are required to submit a schedule of vessel operating costs to Marad each year including such items as vessel capacity, operating speed, fuel consumption at normal operating speed, fuel consumption in port, vessel capitalized costs, interest expenses, port and cargo handling expenses. 46 C.F.R. § 382.2. The Marad rule provides a procedure to determine "fair and reasonable rates for the carriage of preference cargoes" expressed as a cost per ton for a specified voyage taking into account operating costs and capital components including depreciation, return on working capital, return on equity, and brokerage commissions. 46 C.F.R. § 382.3.

Similarly, Section 381.5 of 46 C.F.R., entitled "Fix-American-flag Tonnage First" provides in part:

> Each department or agency having responsibility under the Cargo Preference Act of 1954 shall cause each full shipload of cargo subject to said act to be fixed on U.S.-flag vessels

> prior to any fixture on foreign flag vessels for at least that
> portion of all preference cargoes required by that Act and the
> Food Security Act of 1985 to be shipped on U.S.-flag vessels,
> computed by purchase authorization or other quantitative unit
> satisfactory to the agency involved and the Maritime
> Administration, …

The purpose of the rule is to assure that the required minimum 75% level of participation for U.S.-flag vessels is reached as nearly as practicable and to assure that U.S.-flag movements are evenly distributed throughout the year.

Marad has an informal grievance procedure so that any person with a grievance pertaining to the administration of the Cargo Preference Act may request Marad to afford the person the opportunity to discuss the matter with the interested agencies or other interested parties. 46 C.F.R. § 381.6.

Marad has authority and appropriations to reimburse USAID, USDA and  the Commodity Credit Corporation for the difference between the US-flag rates and the foreign flag rates, called the "ocean freight differential," on cargo covered by the Cargo Preference Act. 46 U.S.C. §1241h. Pursuant to that authority, Marad and USAID have had a memorandum of understanding in place since 1987 to deal with the administration of the payment mechanisms. As of July 2005, Marad was reimbursing USAID approximately 95% of the ocean freight differential expended by USAID for the carriage of commodities on US-flag vessels promptly after funds are expended.

During each program year Marad maintains on its public web site a running total of the tonnages by program, by destination, vessel type, i.e., dry bulk carriers, dry cargo liners and tankers, to inform agencies and carriers.  The program year for purposes of measuring the required percentages of agricultural commodities under Title II runs from October 1 to September 30.  46 U.S.C. app. § 1241 (c)(2). Marad's annual reports show that the annual

tonnages and percentages for the Title II program for liner vessels were:

|      | Total Tons | US Tons | US Percentage |
|------|-----------|---------|---------------|
| 2001 | 988,354   | 586,826 | 59.4 |
| 2002 | 986,585   | 704,996 | 72.8 |
| 2003 | 1,593,359 | 1,193,047 | 74.9 |
| 2004 | 1,552,674 | 1,156,547 | 74.5 |
| 2005 | 1,147,356 | 807,530 | 70.4 |

Thus, for 2005, the Title II liner program was more than 50,000 tons short in US-flag

tonnage.

Marad's annual reports show that the annual tonnages and percentages for the Title

II program for all types of vessels (liner, bulker, and tanker) were:

|      | Total Tons | US Tons | US Percentage |
|------|-----------|---------|---------------|
| 2001 | 2,100,039 | 1,591,891 | 73.5 |
| 2002 | 1,779,256 | 1,188,122 | 66.8 |
| 2003 | 3,143,415 | 2,249,404 | 71.6 |
| 2004 | 3,186,560 | 2,296,734 | 72.1 |
| 2005 | 3,103,322 | 2,055,756 | 66.2 |

Thus, for 2005, the Title II program for all vessels was more than 270,000 tons short of the

minimum 75% for US-flag tonnage.


**B. USAID Grant and Tender for Ocean Carriage.** USAID entered into a one year

grant agreement with CARE, effective April 4, 2005, under which USAID authorized

donation of 7,000 mt of sorghum and other commodities and budgeted funds for the costs

including ocean freight. Administrative Record ("AR") 27 – 35; Plaintiff's Statement of

Material Facts as to Which There is No Genuine Issue ("PSMF") at para. 22 -24.

In Invitation No. 075 dated July 11, 2005 offers for ocean carriage for approximately

2009 metric tons of sorghum in 50 kilogram bags moving under Title II from Dubai, UAE

to Mombasa, Kenya were solicited by brokers of behalf of CARE under the grant. The tender, which was described as "urgent," required offers to be submitted by fax to CARE's agent's offices by 1100 hours on July 13, 2005. In paragraph 7 the tender noted that "Cargo preference compliance will be in accord with the Maritime Administration's January 8, 2003 letter." AR 10. In the January 8, 2003 letter Marad spelled out how USAID and other agencies tonnage would be attributed or "scored" as between US-flag vessel types. PSMF at 22- 27.

On July 13, 2005, ACT through its broker submitted a timely, responsive offer for service by its U.S.-flag vessel, the THUNDER / LIGHTNING ("Vessel"), to carry the bagged sorghum cargo in accordance with the terms of the tender. This vessel is an integrated tug barge that is well suited to carrying of such cargo. AR 22. On July 13, 2005 the Vessel was in Dubai and available to load cargo immediately and sail directly to the discharge port. AR 94; PSMF at 28, 29.

Although ordinarily USAID acts on offers for tenders within two business days, on or about July 19, 2009, seven days after the submission of offers on the tender, USAID made a decision to assign the bagged sorghum to a foreign vessel with a schedule that provided an estimated time of arrival later that ACT's Vessel. AR 24, 26, 94; PSMF 30, 31.

On or about July 20, 2005, ACT learned that the cargo had been assigned tentatively to a foreign flag vessel with later delivery schedule than the Vessel. ACT, through its broker, protested the decision to USAID orally and in writing. AR 88, 89. ACT also applied to Marad for assistance with USAID in accordance with the informal grievance procedure under 46 C.F.R. Section 386.1. After assessing the facts, Marad too protested the action to USAID advising USAID that it was "not in compliance with the cargo preference

8

requirements" and reminding USAID that "AID is reimbursed for the rate differential." AR 91, 94, 95, 97, 98; PSMF 32 -34.

In connection with ACT's protest to Marad, Marad prepared a fair and reasonable analysis of ACT's rate for the tender which yielded a fair and reasonable rate of $300.31 per ton. AR 101. Because the rate offered by ACT was below that amount, it was within the Marad guidelines. At that time the US-flag participation in the title II program was 69.4% for liner vessels and 66.9% for all vessel types. AR 89; PSMF 35, 36.

USAID did not provide any response or rationale for its decision to ACT or to Marad. PSMF 47.

When CARE, through its agent, reported the bids on the tender to USAID, CARE advised that the estimated time of arrival for ACT's Vessel was July 29 and the foreign vessel was August 7. AR 24; PSMF 38.

After the issuance of the tender on July 11, 2005, there was no further correspondence or advice from CARE to USAID regarding changes in the needs or requirements for delivery of the commodities. PSMF 39.

On July 13, 2005, after receipt of the bids, USAID staff initiated a memorandum ("Memorandum") recommending "elect[ion] to rely on the 'notwithstanding' authority … granted to the Agency by P.L. 480 to override compliance with cargo preference rules." AR 26. The Memorandum declared that paying the higher US-flag rates would reduce the amount of Title II resources available to the agency to address critical food needs in that year. AR 26. In the Memorandum USAID compared the rate for the foreign carrier of $65 per ton with the ACT rate of $298 per ton and noted the possible benefit of ACT's offer to deliver the commodities seven days earlier than the non-US-flag vessel. PSMF 40. USAID's

Chief of the Transportation Division in her affidavit for this Court stated that she instructed

CARE to use the foreign vessel for the following reasons:

> Due to the extreme price disparity between the U.S.-flag offer, which was
> nearly five times higher than the non U.S.-flag offer offers (sic) for this
> critical Title II emergency food aid cargo, USAID elected to rely on the
> "notwithstanding" authority (see below) granted to the Agency by P.L. 480
> to override compliance with the cargo preference rules. Paying the higher
> US-flag rates would reduce the amount of Title II resources available to the
> agency and would affect the ability of the program to alleviate the human
> suffering in this region in this fiscal year. I considered the possible benefit of
> ACT's offer to deliver the commodities seven days earlier then the non-U.S.-
> flag vessel and determined the small benefit of somewhat earlier delivery
> was more than offset by the overall harm to the future of the program by
> paying ACT's exorbitant rates.

Affidavit of Denise Scherl dated July 25, 2005 filed in support of Defendants' Opposition to

Temporary Restraining Order.

Based on these considerations, USAID officials sought administrative authority

from the Director, Office of Food for Peace to invoke emergency authorities to override

cargo preference. AR 06. The signer of the Memorandum did not set out any delegation of

authority for the waiver. The signer lacked the authority to waive transportation source

requirements for ocean transportation services under USAID delegations of authority. The

Associate Administrator for Management, who is delegated the authority to waive

application of cargo preference, did not sign the memorandum. PSMF 41; USAID

Automated Directives System at 103.3.8.3 and 103.3.15.3. See USAID website at

www.usaid.gov/policy/ads/100/103.pdf.

The call forward request from CARE to USAID, the document initiating the

movement of sorghum by CARE under the grant agreement, has not been provided in the

Administrative Record. It must be assumed that no such record exists. PSMF 24.

*Nowhere* in this decision making did USAID consider:

10

- that no calculation or data were prepared or used to support USAID's conclusion that ACT's rates were "exorbitant" and, indeed, USAID has no authority, established rule, data, or procedure by which to make such a determination;

- that Marad's role and established rate methodology with its published rule and vessel specific data base was being ignored;

- that USAID will receive reimbursement of 95% of the ocean freight differential from Marad promptly after payment of ocean freight;

- that the Title II program was behind in the liner category by more than 60,000 tons and that the Title II program as a whole was behind by over 250,000 tons for the accounting year; or

- that USAID had no considered plan by which it would meet the 75% minimum Cargo Preference requirement for Title II for the year, which would end less than two months hence on September 30, 2005, and should have evaluated the particular decision in the light of such a plan.

USAID did not respond to the protests of ACT's broker, its counsel, or Marad.

## II.    Discussion

## A.    Jurisdiction

In this action ACT seeks review of a decision by USAID made in the administration of its grant to CARE for donation of certain commodities and transportation. CARE, not USAID, was the party contracting for the ocean transportation services. This court has subject matter jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706, general maritime jurisdiction, 28 U.S.C. § 1333 and federal question, 28 U.S.C. § 1331. The tender seeking offers of ocean transportation was published by CARE on a commercial basis without any standard Federal acquisition

clauses. AR 8 – 11. Accordingly, this action does not challenge a solicitation by a Federal agency within the meaning of 28 U.S.C. § 1491(b)(1). *American President Lines Ltd. v. United States Agency for International Development*, DDC No. 02-01878 (HHK) (jurisdiction in district court proper in challenge to bid process under USAID Title II program).

**B.    Standard of Review**

An administrative decision must stand or fall on the grounds articulated in the agency decision. *SEC v. Chenery Corp.* 332 U.S. 194, 196 (1947). Review of agency action under the arbitrary, capricious standard must be searching and careful. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). "An [agency] order based upon a finding made without evidence, … or upon a finding made upon evidence which clearly does not support it, … is an arbitrary act against which courts afford relief." *Northern Pacific Ry v. Dept. of Public Works*, 268 U.S. 39, 44-45 (1925).

When Congress expressly has delegated a matter to an agency to determine a matter, then Courts are required to defer to the agency decisionmaking process. Where the agency has rules implementing that delegation, then the deference owed is even stronger. An agency may not bootstrap itself into an area in which it has no jurisdiction. *Batterton v. Marshall*, 648 F. 2d, 702-704 (D.C. Cir. 1980); *Adams Fruit v. Barrett*, 494 U.S. 638 (1990). In construing facts, agency decisions command no particular deference in matters as to which the agency has no special expertise or delegated policy role.  See *Salleh v. Christopher*, 85 F.3d 689, 692 (D.C. Cir. 1996).

Certainly, Marad, not USAID, has been accorded the authority to administer the Cargo Preference Act. In passing on a dispute between Marad, on the one hand, and USDA and USAID, on the other, the US Department of Justice, Office of Legal Counsel determined that "Marad's statutory authority is broad enough to warrant issuance of charter term regulations" that would prescribe substantive charter terms for charters issued by USDA and USAID. See Memorandum of Walter Dellinger, US Department of Justice Office of Legal Counsel to General Counsel US Department of Transportation dated April 19, 1994 ("OLC Memorandum") citing *inter alia*, *States Marine International v. Peterson*, 518 F.2d 1070, 1079 (D.C. Cir. 1975), *cert. denied*, 424 U.S. 912 (1976) and *American President Lines, Ltd. v. United States*, 821 F.2d 1571 (Fed. Cir. 1987). The OLC Memorandum noted the amendment of the Cargo Preference Act in 1970 was "intended to foster uniformity of administration and to advance the basic goals of the [Cargo Preference Act] by giving the Secretary [of Transportation] the power to impose regulatory control over participating agencies in their administration of cargo preference programs." OLC Memorandum at 7. Moreover, the OLC concluded that "Marad's regulatory jurisdiction encompasses administrative measures designed to foster the availability of reasonable-rate U.S. vessels to pursue the preference trade, as well as overseeing the allocation of the minimum cargo preference percentages." OLC Memorandum at 15. See also See *American Maritime Association v. United States*, 766 F.2d 545, 551 (D.C. Cir. 1985) (Congress gave Marad "broad discretion to supervise the implementation of the 1970 amendments" to the Cargo Preference Act.); *City of Milwaukee v. Yeutter*, 877 F. 2d 540 (7th Cir. 1989) (sustaining Marad regulation under Cargo Preference Act of Title II bidding practices over challenge of port interests).

The authority to establish fair and reasonable rate under the Cargo Preference Act has been delegated by Congress to Marad and the Marad rules at Part 382 implement that authority. See 46 C.F.R. Part 382. When the rule was revised in 1998, Marad carefully set out its authority to establish procedures and methodologies to determine fair and reasonable rates under the Cargo Preference Act.  See 63 *Fed. Reg*. 319 (January 27, 1998) ("Section 901(b)(2) of the Act [46 U.S.C. 1241(b)] of the Act provides authority for Marad (by delegation form the Secretary of Transportation) to issue regulations governing the administration of section 901(b)(1)."). See *Rainbow Navigation, Inc. v. Department of Navy*, 783 F. 2d 1072, 1078, 1079 (D.C. Cir. 1986) (comparing the rate approval methodology under the Cargo Preference Act with that of the 1904 Cargo Preference Act).

In short, Marad authority to determine fair and reasonable rates under the Cargo Preference Act is paramount and USAID has no such authority.


**B.     The USAID Decision Was Manifestly Wrong and Must be Set Aside**


Here, the determination by USAID that ACT's rates were "exorbitant" was unsupported by any data, by any calculation, or any specific rule or authority. It rested solely on a raw reaction to the difference between the US and foreign rate. The Marad determination of fair and reasonable rates was supported by data collected in advance on the Vessel, by a methodology set out by duly adopted rule, by a specific calculation for the voyage and backed up by experience and a statutory mandate to supervise such rates.

In this rate review "contest" the Marad determination of reasonableness must prevail and, conversely, the USAID determination must be declared clear error.

The determination that USAID intended to save money for the Title II program is equally flawed. USAID never acknowledged or considered that it is reimbursed for the ocean freight differential by Marad. The decision Memorandum, based on the proposition that use of the foreign vessel would save USAID $224 per ton, materially overestimates the savings sought. In fact, owing to the reimbursement of OFD by Marad, the amount that may be saved is a mere fraction of that, 5% of $224 or $11.20 per ton. The reimbursement scheme is a basic feature of the entire program so it could scarcely be a matter that might escape the attention of USAID; even if it had, Marad reminded USAID of that fact. AR 91, 97. In addition, the grant to CARE for a fixed sum over fiscal year 2005 and 2006 would not recognize any savings until later in the grant cycle. CARE did not make the request to override US-flag and, indeed, seems not to have been consulted in the decision.

Conspicuously absent from the USAID calculus was an acknowledgment that it was seriously in arrears in meeting its the statutory  mandate to lift the minimum 75% of the Title II tonnage on US-flag vessels in the year with less than two months to the end of the year. The shortages of more than 50,000 tons short in the liner category and more that 250,000 tons short in the Title II program were *never* considered by USAID. The program ended the accounting year on September 30 with a deficit for the Title II program representing a loss of more than $41 million to the U.S. merchant marine.

Finally, the waiver Memorandum is itself irregular. The USAID manager who approved the waiver lacked the authority to waive nationality requirements for ocean

transportation. The decision never altered the "urgent" term of the tender which should have resulted in use of ATC's earlier discharge schedule.

In sum, the USAID election to resort to emergency authorities to avoid rates it considered "exorbitant" was based on facially flawed premises and willful disregard of well known programmatic circumstances. The decision to fix the foreign vessel based on the Memorandum purporting to change in the status of the tender from ordinary coverage under Cargo Preference owing to the alleged cost excess cannot withstand even cursory review. The decision must be set aside.

It is equally important to note what is not at stake here. In its opposition to the temporary restraining order, the Government relied upon the decision in *Crowley Caribbean Transport, Inc. v United States*, 865 F.2d 1281 (D.C. Cir. 1989) for the proposition that the provisions of 22 U.S.C. § 2292(b), authorizing provision of disaster assistance "notwithstanding any other provision of law," exempted USAID from cargo preference entirely. The *Crowley* decision upheld a district court decision on the pleadings without an agency record approving the use of non-US-flag vessels for specially appropriated disaster relief for El Salvador earthquake victims. The application of and resort to the emergency authorities was unchallenged. The *Crowley* decision did *not* involve a challenge to the regularity of a decision to invoke emergency authorities to alter the Cargo Preference status of a tender after publication. Indeed, the request to override cargo preference did not originate with the grantee, CARE, and no term or condition of the grant authorized such an action. See AR 56, 57 (grant specifies application of Cargo Preference and permits departure upon the request of CARE, after

consultation with Marad). This action challenges the regularity of the basis for invoking the provisions of 7 U.S.C. § 1722[2] including the authority of the decisionmaker.

In sum, the rationale for the USAID decision to invoke emergency authorities was nothing short of indefensible. It must be set aside as arbitrary, capricious and not in accordance with law.  The outcome of this action will be important to ACT and other carriers that regularly offer to carry Title II cargoes. Reduced to its essentials, ACT believes that USAID must consult with and defer to Marad on US-flag rate determinations; that USAID must adequately plan to meet the required minimum US-flag 75% participation in the Title II program; that USAID must actually meet or exceed the 75% requirement; and the USAID decisions on US-flag offers must take account of the fact that it will be reimbursed ocean freight differential by Marad.

### C.    Relief

For relief ACT seeks an order setting aside the USAID decision to override cargo preference and declaring it to be arbitrary, capricious and not in accordance with law. ACT requests a ruling that USAID must defer to Marad in fair and reasonable rate determinations under the Cargo Preference Act.

---

[2] In any event the language and intention of 7 U.S.C. § 1722 is different from that of Section 2292(a). Section 1722 permits "notwithstanding any other provision of law" the Administrator of USAID "to provide agricultural commodities" to private agencies "in such manner and on such terms and conditions as the Administrator determines appropriate to respond to the emergency." This provision was introduced in 1990 as part of Pub. L. 101-624, 140 Stat 3636. The legislative history of the amendment declares that

> None of the revisions to Public Law 480 contained in this legislation are
> intended to modify, alter, or reduce the 75 per cent U.S. flag shipping
> requirement provided for under current law.

S. Rept. No. 357, 101st Cong., 2nd Sess. at 168 (1990), reprinted at 1990 *US Code and Administrative News* 4856. The OLC Memorandum at 13 rendered a similar reading in 1994 construing the language in 7 U.S.C. § 173a(d)(2).

ACT further seeks an order that USAID must make up in cargo preference year 2006 the deficit of 271,735 metric tons incurred in fiscal year 2005 in the Title II program.  Award of costs and fees are sought as well.

## II.    Conclusion

For the forgoing reasons the USAID decision to override cargo preference in Invitation No. 075 must be set aside. A proposed order is submitted herewith.

Respectfully submitted,

Timothy B. Shea

DC Bar No. 234005
Nemirow Hu & Shea
1629 K Street, NW Suite 500
Washington, DC 20036
202 835 0300

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                             )
AMERICA CARGO                                )
TRANSPORT, INC.                              )
                                             )
        Plaintiff,                           )
                                             )
    v.                                       )          Civil Action No.: 05-1452 (RBW)
                                             )
ANDEW S. NATSIOS,                            )
U.S. AGENCY FOR INTERNATIONAL                )
DEVELOPMENT,                                 )
and JOHN JAMIAN, ACTING                      )
MARITIME ADMINISTRATOR,                      )
DEPARTMENT OF TRANSPORTATION,                )
                                             )
        Defendants.                          )
_____)

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS
NO GENUINE ISSUE**

Plaintiff, America Cargo Transport, Inc., hereby submits this Statement of Material

Facts as to Which There is No Genuine Issue pursuant to Fed. R. Civ. P., Rule 56 and Local

Civil Rule 7(h).

1.  America Cargo Transport, Inc. ("ACT"), a company organized under the laws the State

    of Washington, owns US flag vessels operating in the foreign commerce of the United

    States. Complaint Para. 1.

2.  Defendant the Honorable Andrew Natsios is the Administrator of the United States

    Agency for International Development.  As such, he is charged with, <u>inter</u> <u>alia</u>,

    administration of the Agricultural Trade Development and Assistance Act of 1954, 7

    U.S.C. § 1721 <u>et seq.</u>, ("Title II") and the arrangement of ocean transportation for certain

1

grant or aid cargoes consistent with the requirements of the Cargo Preference Act of 1954.

3. Defendant John Jamian is the Acting Administrator of the Maritime Administration ("Marad"), a modal unit of the Department of Transportation.  Marad is charged with promoting the United States merchant marine and administering the Cargo Preference Act of 1954.

**Programmatic Background**

4. When the United States procures or contracts for commodities for its own account or furnishes commodities to a foreign nation without provision for reimbursement, the agencies shipping the cargo are required to take such steps as are necessary to assure that privately owned U.S.-flag vessels transport a specified percentage of the tonnage of materials and commodities to the extent such vessels are available at fair and reasonable rates for U.S.-flag commercial vessels by geographic areas, that is, by country of destination.  For agricultural commodities or products thereof, at least seventy five percent of the gross tonnage must be transported on U.S.-flag commercial vessels.  Cargo Preference Act of 1954, 46 U.S.C. app. § 1241; Title IX of the Food Security Act of 1985, 46 U.S.C. app. § 1241e.

5. "Every department or agency having responsibility under [the Cargo Preference Act of 1954 is required to] administer its programs with respect to [preference cargoes] under regulations issued by [Marad]."  46 U.S.C. app. § 1241 (b)(2).

6. Marad has promulgated regulations governing the administration of the Cargo Preference program at 46 C.F.R. Part 381 et seq.

7. Marad has a procedure to determine the fairness and reasonableness of rates for U.S.-flag

vessels set out in 46 C.F.R. § 382.1 et seq. Under the rule, US flag operators, including ACT, are required to submit a schedule of vessel operating costs to Marad each year including such items as vessel capacity, operating speed, fuel consumption at normal operating speed, fuel consumption in port, vessel capitalized costs and interest expenses. Port and cargo handling information and expenses are required to be reported as well. 46 C.F.R. Section 382.2.

8. The Marad rule provides a procedure to determine "fair and reasonable rates for the carriage of preference cargoes" expressed as a cost per ton for a specified voyage taking into account operating costs and capital components including depreciation, return on working capital, return on equity, and brokerage commissions. 46 C.F.R. Section 382.3.

9. Section 381.5 of 46 C.F.R., entitled "Fix-American-flag Tonnage First" provides in part:

> Each department or agency having responsibility under the Cargo Preference Act of 1954 shall cause each full shipload of cargo subject to said act to be fixed on U.S.-flag vessels prior to any fixture on foreign flag vessels for at least that portion of all preference cargoes required by that Act and the Food Security Act of 1985 to be shipped on U.S.-flag vessels, computed by purchase authorization or other quantitative unit satisfactory to the agency involved and the Maritime Administration, …

The purpose of the rule is to assure that the required minimum 75% level of participation for U.S.-flag vessels is maintained as nearly as practicable and to assure that U.S.-flag movements are evenly distributed throughout the year.

10. Marad has an informal grievance procedure so that any person with a grievance pertaining to the administration of the Cargo Preference Act may request Marad to afford the person an opportunity to discuss the matter with the interested agencies or other interested parties. 46 C.F.R. Section 381.6.

3

11. Marad makes payments to the agriculture agencies, United States Department of Agriculture, the Commodity Credit Corporation ("CCC") and the USAID, to offset the cost of US flag carriage. Marad has authority and appropriations to reimburse these agencies for the difference between the US flag rates and the foreign flag rates, called the ocean freight differential ("OFD"), on cargo covered by the Cargo Preference Act. 46 U.S.C. §1241h. Pursuant to that authority Marad and USAID have had a memorandum of understanding in place since 1987 to deal with the administration of the payment mechanisms.

12. As of July 2005, Marad was reimbursing CCC and USAID more than 90 cents on each dollar of OFD. Approximately, 95% of the ocean freight differential paid by USAID for the carriage of commodities on US flag vessels at this time was reimbursed by Marad to USAID promptly after funds are expended. The reimbursement is based on the amount by which ocean carriage exceed 20% of the program costs in the fiscal year and the OFD associated with the movement of 25% of cargo above 50% prescribed in the Cargo Preference Act for agricultural commodities.  46 U.S.C. app. § 1241h(b).

13. The Cargo Preference Act of 1954 requirement that at least 75% of the agricultural commodities shipped by agencies be shipped by U.S.-flag vessel "computed separately for dry bulk carriers, dry cargo liners, and tankers" means that the 75% minimum for agricultural commodities must be computed separately for each category of vessel.  This provision is intended to assure that the cargoes are fairly distributed among each of the three vessel types.

14. During each program year Marad maintains a public web site with running total of the tonnages by program, by destination, vessel type, i.e., dry bulk carriers, dry cargo liners

and tankers, to inform agencies and carriers of the current US flag percentages.

15. The program year for purposes of measuring the required percentages of agricultural commodities, under Title II runs from October 1 to September 30. 46 U.S.C. app. § 1241 (c)(2).

16. Marad's annual reports show that the annual tonnages and percentages for the Title II program for liner vessels were :

|      | Total Tons | US Tons   | US Percentage |
|------|-----------|-----------|---------------|
| 2001 | 988,354   | 586,826   | 59.4          |
| 2002 | 986,585   | 704,996   | 72.8          |
| 2003 | 1,593,359 | 1,193,047 | 74.9          |
| 2004 | 1,552,674 | 1,156,547 | 74.5          |
| 2005 | 1,147,356 | 807,530   | 70.4          |

Thus, for 2005, the Title II liner program was more than 50,000 tons short in US flag tonnage.

17. Marad's annual reports show that the annual tonnages and percentages for the Title II program for all types of vessels (liner, bulker, and tanker) were :

|      | Total Tons | US Tons   | US Percentage |
|------|-----------|-----------|---------------|
| 2001 | 2,100,039 | 1,591,891 | 73.5          |
| 2002 | 1,779,256 | 1,188,122 | 66.8          |
| 2003 | 3,143,415 | 2,249,404 | 71.6          |
| 2004 | 3,186,560 | 2,296,734 | 72.1          |
| 2005 | 3,103,32  | 2,055,756 | 66.2          |

5

Thus, for 2005, the Title II program for all vessels was more than 270,000 tons short of the minimum 75% for US flag tonnage. At the average rate of $152.70 per ton for 2005, this deficit represents more than $41 million to the US merchant marine.

18. Plaintiff's vessel THUNDER/LIGHTNING is a liner vessel for purposes of the Cargo Preference Act and Marad reporting.

19. Under Title II agricultural commodities may be donated to recipients, usually private humanitarian relief funds or private voluntary organizations ("PVO's"), that arrange the transportation and distribution of the relief commodities.  The PVO's arrange the ocean transportation under the guidance and direction of USAID.

20. In arranging the ocean transportation of these cargoes USAID is governed by the Cargo Preference Act of 1954 and the Marad rules implementing the act to assure the participation of U.S.-flag vessels in the carriage of these cargoes. USAID has guidelines and rules implementing its cargo preference activities. USAID's Automated Directives System in chapter 315 guides agency activity "to insure that ocean shipments of commodities are in accordance with the requirements of the Cargo Preference Act and with the regulations issued by the Maritime Administration …." USAID Automated Directives System Chapter 315, USAID website at www.usaid.gov/policy/ads/100/103.pdf.  In addition, USAID has rules governing the circumstances in which Cargo Preference may be waived to assure adequate competition. 22 C.F.R. § 228.55.

21. In administering Title II, USAID usually purchases specified commodities for delivery at designated U.S. ports. PVO's, through appointed freight forwarders or brokers, solicit

ocean rate quotations on parcels of commodities in response to published tenders timed for the period after the commodities are scheduled to arrive at port.   The freight solicitation may combine several parcels from several U.S. ports to one or more foreign destination ports.   The tenders usually seek rate quotations for U.S.-flag and foreign flag vessels.   Based on the offers, USAID will assign certain cargoes to U.S.-flag and others to foreign flag after receipt of the offers. Based on those instructions from USAID, the offers of the ocean carriers are accepted or rejected by the PVO.

22. USAID has a grant agreement with CARE, the term of which is April 2005 to April 2006, to donate commodities and transportation to assist feeding certain populations of Kenya and Somalia. Under the grant USAID authorized donation of 7,000 mt of sorghum and other commodities and budgeted funds for the costs including ocean freight. AR 27 – 35. Under the grant agreement, "[f]unds obligated hereunder are available for program expenditures for the estimated period April 4, 2005 to April 3, 2006…." AR 36, 41.

23. The funds for the grant to CARE as amended were set aside for that purpose upon execution of the grant and amendments thereto in April 2005. AR 35, 37, 41. Amounts not expended under the grant to CARE over amounts budgeted in the grant would not be realized until the end of the grant contract in April 2006 or thereabouts.

24. Under the grant agreement, for commodities the be transferred to CARE, CARE was required to initiate a "call forward" request to USAID specifying the delivery schedule, port of discharge, and consignee's name. AR 47. The call forward request from CARE for the sorghum moving under Invitation No. 075 has not been provided in the Administrative Record by USAID.

25. The CARE grant specifies application of Cargo Preference and permits departure from

Cargo Preference upon the request of CARE only after consultation with Marad. AR 56, 57.

26. In Invitation No. 075 dated July 11, 2005 offers for ocean carriage for approximately 2009 metric tons of sorghum in 50 kilogram bags moving under Title II from Dubai, UAE to Mombasa, Kenya were solicited by brokers of behalf of a PVO, CARE. The tender, which was described as "urgent," required offers to be submitted by fax to CARE's agent's offices by 1100 hours on July 13, 2005. AR 9-13.

27. In paragraph 7 the tender noted that "Cargo preference compliance will be in accord with the Maritime Administration's January 8, 2003 letter." AR 10. The January 8, 2003 letter from Marad provided guidance on how to account for US flag tonnages covered by Cargo Preference and was a standard instruction for preference cargoes.

28. On July 13, 2005, ACT through its broker submitted a timely, responsive offer for service by its U.S.-flag vessel, the THUNDER / LIGHTNING ("Vessel"), to carry the bagged sorghum cargo in accordance with the terms of the tender. This vessel is an integrated tug barge that is well suited to carrying of such cargo. AR 22.

29. On July 13, 2005 ACT's Vessel was in Dubai and available to load cargo immediately and sail directly to the discharge port. AR 94.

30. Ordinarily, USAID acts on offers for urgent tenders within two business days. It is very unusual for the agency to withhold action on offers for more than four days. AR 93.

31. On or about July 19, 2005, seven days after the submission of offers on the tender, USAID made a decision to assign the bagged sorghum to a foreign vessel with a schedule that provided an estimated time of arrival later that ACT's Vessel. AR 24, 26.

32. On or about July 20, 2005 ACT learned that the cargo had been assigned tentatively to

foreign flag vessels with later delivery schedule than ACT's Vessel. Specifically, the ACT Vessel was scheduled to deliver the cargo by a direct non-stop sailing within nine days from loading. The foreign vessel awarded the cargo maintained an indirect schedule that would provide for discharge in 14 days after three intermediate port calls. AR 94.

33. ACT, through its broker, protested the decision to USAID orally and in writing. AR 88, 89.

34. ACT also applied to Marad for assistance with USAID. Marad staff discussed the decision several times with USAID. By email of July 21, 2005 Marad too protested the action to USAID advising USAID that it was "not in compliance with the cargo preference requirements" and reminding USAID that "AID is reimbursed for the rate differential. It is difficult to understand how this can now be called emergency cargo when AID waited over a week to book it on the foreign vessel while the US vessel could have lifted it over a week ago." AR 91, 94, 95, 97, 98.

35. In connection with ACT's protest to Marad, Marad prepared a fair and reasonable analysis of ACT's rate for the tender which yielded a fair and reasonable rate of $300.31 per ton for ACT's Vessel. AR 101. The per ton rate offered by ACT on the Vessel, $298 per mt, was below that amount and, therefore, was within the Marad guidelines for reasonableness. AR 22, 24.

36. At that time the US flag participation in the title II program was 69.4% for liner vessels and 66.9% for all vessel types – well below the required 75% participation. AR 69.

37. USAID did not provide any response or rationale for its action to ACT.

38. When CARE reported the bids on the tender to USAID, it advised USAID that the estimated time of arrival for ACT's Vessel was July 29 and the foreign vessel as August

7. AR 24.

39. After the issuance of the tender on July 11, 2005, there was no further correspondence or advice from CARE to USAID changing the needs or requirements for delivery of the commodities.

40. On July 13, 2005 USAID staff initiated a memorandum ("Memorandum") recommending that the agency change the legal obligation to observe Cargo Preference as provided in the tender by invoking certain emergency authorities. AR 26. In its Memorandum USAID cited "the extreme disparity between US flag offers and the non-US flag offers" as the rationale for its "elect[ion] to rely on the 'notwithstanding' authority … granted to the Agency by P.L. 480 to override compliance with cargo preference rules." The Memorandum declared that paying the higher US flag rates would reduce the amount of Title II resources available to the agency to address critical food needs in the fiscal year. AR  07.

41. In the Memorandum USAID compared the rate for the foreign carrier of $65 per ton with the ACT rate of $298 per ton and considered the possible benefit of ACT's offer to deliver the commodities earlier than the non-US flag vessel. USAID instructed CARE to use the foreign vessel because:

> Due to the extreme price disparity between the US flag offer, which was nearly five times higher than the non US flag offer offers (sic) for this critical Title II emergency food aid cargo, USAID elected to rely on the "notwithstanding" authority (see below) granted to the Agency by P.L. 480 to override compliance with the cargo preference rules. Paying the higher US flag rates would reduce the amount of Title II resources available to the agency and would affect the ability of the program to alleviate the human suffering in this region in this fiscal year. I considered the possible benefit of ACT's offer to deliver the commodities seven days earlier than the non-US-flag vessel

10

and determined the small benefit of somewhat earlier delivery was more than offset by the overall harm to the future of the program by paying ACT's exorbitant rates.

Affidavit of Denise Scherl dated July 25, 2005 filed in support of Defendants' Opposition to Temporary Restraining Order. Based on these considerations USAID officials sought administrative authority at USAID to invoke "notwithstanding" authorities to override cargo preference. The USAID official who endorsed the Memorandum, the Director of the Office of Food for Peace, does not have authority to waive application of cargo preference; that authority is delegated to the Assistant Administrator for Management under the agency relegations of authorities. See USAID Automated Directives System at sections 103.3.8.3 and 103.3.15.3 at www.usaid.gov/policy/ads/100/103.pdf.

42. Nowhere in this decision making did USAID consider the fact that it will receive reimbursement of 95% of the ocean freight differential from Marad promptly after payment of ocean freight.

43. No calculation or data were prepared or used to support the conclusion by USAID that ACT's rates were "exorbitant." Indeed, USAID has no established rule, data, or procedure by which to make such a determination.

44. Nowhere in its decision to invoke the "notwithstanding" authorities did USAID take into account the fact that the Title II program was behind in the liner category by some 60,000 tons and that the Title II program as a whole was behind by over 250,000 tons; nor did USAID consider the means by which USAID would meet the statutory Cargo Preference 75% requirement for Title II for the year which would end on September 30, 2005.

45. ACT's Vessel is considered to be a liner vessel by Marad.

46. By letter and emails of July 20 and 21, 2005 to USAID, ACT, through its counsel, protested the decision to allocate the bagged sorghum to foreign vessels with slower delivery as not in accordance with the terms of the tender and the Cargo Preference law.

47. USAID did not respond to ACT or its counsel.

Respectfully submitted,

Timothy B. Shea

DC Bar No. 234005
Nemirow Hu & Shea
1629 K Street, NW Suite 500
Washington, DC 20036
Telephone 202 835 0300