UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                              :
AMERICAN CARGO TRANSPORT,     :
                              :
          Plaintiff,          :
                              :
     v.                       :  CV 05-1452
                              :
NATSIOS,                      :
                              :
          Defendant.          :
- - - - - - - - - - - - - - x

                         Washington, D.C.
                         July 26, 2005
                         3:30 p.m.


                    Transcript of TRO Hearing
              Before the Honorable Reggie B. Walton
                 United States District Judge


APPEARANCES:

For the Plaintiff:          TIMOTHY B. SHEA, ESQ.
                            KEVIN CALLAHAN, ESQ.

For the Defendant:          JOHN TRUONG, ESQ.
                            WILLIAM C. BUCKHOLD, ESQ.
                            MURRAY A. BLOOM, ESQ.
                            WARREN LEASHMAN, ESQ.

Court Reporter:             JON HUNDLEY
                            Miller Reporting Company
                            735 8th Street, SE
                            Washington, D.C. 20003
                            (202) 546-6666



GOVERNMENT
EXHIBIT
_B_____

1                    P R O C E E D I N G S

2              THE DEPUTY CLERK:  Civil Action No. 05-

3    1452, American Cargo Transport v. NATSIOS.

4    Counsel, can you please identify yourselves for the

5    record.

6              MR. SHEA:  Your Honor, I'm Timothy Shea.

7    I am here on behalf of plaintiffs American Cargo

8    Transport.  I have with me Kevin Callahan, who is

9    D.C. counsel for the corporation.

10             THE COURT:  Good afternoon.

11             MR. TRUONG:  Good afternoon, Your Honor.

12   My name is John Truong for the United States

13   government.  At counsel's table I have Mr. Murray

14   Bloom from the Maritime Administration; I have Mr.

15   Bill Buckhold from USAID, and with him is Warren

16   Leashman, also from USAID.

17             THE COURT:  Good afternoon.

18             Mr. Shea, how do you construe the

19   emergency provision, that being section 1772(a) of

20   title VII?  I mean what impact does that have on

21   the overall legislative scheme if a determination

22   is made that this provision applies?  Does that

23   mean that the percentage requirement for U.S.

24   shippers, that that doesn't become a part of the

25   mix in assignment whether the percentage

1    requirement has been satisfied?

2            MR. SHEA:  I understand, Your Honor.  This

3    is a kind of -- it's an agency sort of trump card,

4    Your Honor, if I may characterize it that way.  The

5    answer to that is in this case the invitation

6    specifically referenced cargo preference

7    requirements, and there is nothing in the

8    invitation that was issued that suggested that they

9    were going to procure -- that they were going to

10   undertake this activity out of the ordinary course.

11           So, for instance, which is attachment 1 to

12   our affidavit, the original invitation seeking bids

13   from carriers states, among other things, cargo

14   preference compliance will be in accordance with

15   the Maritime Administration's January 8th, 2003

16   letter, which is basically a letter about how they

17   score U.S. v. foreign.

18           So there is nothing in the original action

19   that contemplated procurement out of the ordinary

20   course such as invoking this specific provision.

21           THE COURT:  Are you suggesting that when

22   they issued that initial communication, that they

23   had to designate that this emergency provision

24   would apply?

25           MR. SHEA:  That's correct.  This is --

1   what they have done here is a <u>post hac</u>

2   rationalization, I will suggest, Your Honor, number

3   one.

4         Number two, the actual determination they

5   make is fairly specific. It says, first of all, of

6   course, there was urgency in all this, and as you

7   understand, of course, ATC's ship was in the port

8   and available, and actually could have loaded the

9   cargo almost immediately.

10        What -- the agency built in a certain

11   amount of delay to review their offers, but

12   eventually what happened, they made a

13   determination, which is reflected in the

14   affidavits, that the cost of using ATC's offer was

15   -- outweighed the fact that they were a faster

16   vessel by seven days, I believe is what they

17   acknowledge in the affidavit.

18        Again, there is nothing in the

19   solicitation that suggests that they would do that

20   out of the ordinary course, number one.

21        Number two, that was really a rate

22   determination. The preference act has a provision

23   in it -- it doesn't say that U.S. carriers can

24   offer anything they wan and they will -- the

25   government shippers are required to give them the

ar

5

1    cargo.  The statute says if they do it at fair and

2    reasonable rates, they are entitled to carry 75

3    percent.

4         That determination about fair and

5    reasonable rates is assigned to the Maritime

6    Administration, and conspicuously here AID never

7    asked the Maritime Administration for a rate

8    determination.

9         So what we have really is a rate

10   determination masquerading as a kind of

11   programmatic decision.

12        The other thing --

13        THE COURT:  You agree it was a significant

14   disparity between what --

15        MR. SHEA:  Yes.

16        THE COURT:  -- your client was going to

17   charge --

18        MR. SHEA:  Yes.  I do.  I do.

19        Now but there is no determination anywhere

20   that that's unreasonable, that in fact there is a

21   mechanism by which AID can ask the Maritime

22   Administration for a rate determination, and the

23   Maritime Administration actually has on file the

24   cost elements for each U.S. carrier, including this

25   carrier, and they make a rate determination.  They

ar                                                                    6

1    look at the length of the voyage, they look -- they

2    have a -- it's published in their rules.  They have

3    a way of evaluating capital costs and things like

4    that.

5              AID never made that request.  What AID did

6    was make the determination unilateral.  And what --

7    that really was a specific rate determination.

8              Now the background of this is that AID is

9    required to ship 75 percent of this particular

10   program, title II, on U.S. flag vessels.

11             THE COURT:  Let me just ask you in that

12   regard, assuming you are correct in reference to

13   the emergency provision, does that percentage ratio

14   have to be constant throughout the entire year?

15   Can it be out of balance at some point during the

16   year?

17             MR. SHEA:  The answer is it could perhaps

18   be out of balance, Your Honor, but in this

19   particular -- let me explain that the calendar

20   year, the scoring year, what we would call, for

21   this begins October 1 and ends September 30.  In

22   this case -- not only that, number one, number two,

23   the Maritime Administration keeps on its Web site,

24   advises the public where they are with respect to

25   on these percentages.

1          In this particular -- and so the MARAD's

2    numbers account not only for what has moved, but

3    what has been booked, so it's forward.  If you look

4    at what is in there today, it reflects what has

5    been booked.

6          So we are talking about something let's

7    say another two weeks forward from now is reflected

8    in MARAD's statistics.  MARAD's statistics shows

9    that they are somewhere around 60 something

10   percent, and that the deficit for the program is

11   approximately 320,000 -- thousand -- metric tons.

12   Okay.

13         So in this case we are talking about they

14   have decided that 2,000 tons are going to threaten

15   their entire program, when the entire program is

16   out of whack by 320,000 tons.

17         THE COURT:  Let me just ask this:  Do you

18   have any proof in reference to prior years that

19   there has been noncompliance with the ratio?

20         MR. SHEA:  Yes.  The Maritime

21   Administration keeps -- frankly, Your Honor, this

22   has been -- this -- the answer is yes, the Maritime

23   Administration keeps statistics, and they are

24   readily available.  Perhaps I should have appeared

25   here with them, Your Honor, but I can supply you

1    with copies of what MARAD shows them as today.  In

2    making up 300,000 tons plus in this program in six

3    weeks -- and I have a supplemental affidavit from

4    our affiant, the broker, is very, very onerous, and

5    extremely --

6              THE COURT:  I don't think that really

7    answers my question as to whether in past years

8    there has been noncompliance.

9              MR. SHEA:  The answer is there has been

10   noncompliance in past years, and we can document

11   that readily.

12             THE COURT:  Okay.  Let me hear from the

13   government.  Then I'll give you an opportunity to

14   reply.

15             MR. TRUONG:  Thank you, Your Honor.

16             The -- this case is quite simple,

17   actually.  We don't need to actually talk about the

18   rate determination, tonnage reports, calculation of

19   how much weight has been transported.  The bottom

20   line is this:

21             The USAID, within its statutory

22   discretion, invoked the notwithstanding provision

23   under the law.

24             THE COURT:  Can they do without having

25   previously indicated that they intended to do that?

1              MR. TRUONG:  Yes, they can, Your Honor.

2    There is no regulation --

3              THE COURT:  Under what authority?

4              MR. TRUONG:  I'm sorry?

5              THE COURT:  Under what authority can they

6    do that?

7              MR. TRUONG:  The authority that there is

8    nothing to prevent them from doing so.  There is no

9    regulation or statutory provision that dictates

10   when and how a particular administrator for the

11   USAID to invoke that particular provision.

12             And I think if -- and the Court hits the

13   nail ont head when the Court asked the questions

14   about the provision and the Crowley case that we

15   submitted, and we cited in our brief, speaks to

16   that point exactly.  The USAID in that particular

17   case invoked the provision exemption after learning

18   how expensive the American ships are.  So they

19   invoked that provision and awarded the --

20             THE COURT:  Did the case address the issue

21   of whether there had been an initial indication of

22   whether this provision would be applicable?  In the

23   case that you rely upon.

24             MR. TRUONG:  Right.  The Crowley case

25   revealed a related provision that is very

1    substantially similar to what we have here.  In

2    that particular provision in the <u>Crowley</u> case deals

3    with the Foreign Assistance Act, and disaster

4    relief.

5          In this case, administered by the USAID,

6    both in <u>Crowley</u> and in this case, this case deals

7    with emergency food relief for famine and to help

8    developing countries around the world.  And both

9    provisions are very substantially similar.

10          THE COURT:  Had there been an

11   advertisement in the <u>Crowley</u> case for -- or a

12   solicitation, at least, for bids?

13          MR. TRUONG:  The --

14          THE COURT:  Or do you know that?

15          MR. TRUONG:  We don't know that, actually.

16   The decision by the D.C. Circuit does not even

17   address that point.  But --

18          THE COURT:  But  you're saying the

19   decision to invoke the emergency provision occurred

20   after the pricing came in?

21          MR. TRUONG:  Within the context of that

22   decision, one -- we can infer -- in fact, we

23   construe the opinion to say that the administrator

24   for the USAID can invoke that provision at any

25   time, even after the advertisement, as counsel has

ar

1  pointed out, even after we advertised the bid

2  offer.

3         THE COURT:  And did the Court in that case

4  analyze why from the standpoint of pricing it was

5  appropriate to invoke the emergency provision?

6         MR. TRUONG:  Absolutely.  In fact, there

7  is a section in that particular -- excuse me, Your

8  Honor.

9         [Pause.]

10        MR. TRUONG:  In fact, Your Honor, on page

11 --

12        THE COURT:  Hold on, let me find the case.

13 I've got it.

14        MR. TRUONG:  The exact citation, Your

15 Honor, is 865 F2d.  The pinpoint site is 1282, on

16 the second column, the Court in Crowley actually

17 said that -- pardon me, Your Honor, it's actually

18 1283 -- the Court in Crowley actually said that the

19 purpose of invoking the exemption is to maximize

20 the value, the dollar value that would be going to

21 disaster relief.

22        In other words, to put it bluntly, one

23 dollar that goes to transportation costs is another

24 dollar less to go towards disaster relief, and

25 that's the rationality of the Court.

1        We have exact same case here.  One dollar

2   goes for the transportation cost is another dollar

3   less to feeding people around the world, including

4   Somalia.

5        THE COURT:  So are you suggesting that

6   because of that, this particular situation is not

7   factored into the percentage ratio that the statute

8   requires be met?

9        MR. TRUONG:  It is one factor, that's

10  correct, Your Honor.  It is one factor among others

11  that factor into the sort of overall requirement

12  under the Cargo Preference Act.

13       THE COURT:  And are you saying that if an

14  appropriate emergency determination is made that

15  that particular shipping is not considered in the

16  overall ratio as to whether the cargo statute is

17  being complied with?

18       MR. TRUONG:  That's correct, Your Honor,

19  once the USAID invokes that particular exemption,

20  then the tonnage for that shipment cannot be

21  counted towards the CPA, or the Cargo Preference

22  Act overall tonnage to meet the 75 percent

23  requirement.

24       THE COURT:  Are there any hoops that you

25  need to jump through in order to justify the

1   invocation of the emergency provision other than

2   the cost factor?

3           MR. TRUONG:  In fact, I'm glad the Court

4   brought up that point.  The cost is one of many

5   factors.  And one of the overarching factors is the

6   emergency nature of the effort, and that is the

7   provision is invoked to provide emergency food

8   relief, not necessarily just this particular

9   situation we have here, but overall.

10          In other words, the food and security

11  situation in Africa is considered an emergency.

12  And, in fact, the provision that allows the USAID

13  to provide food around the world is called the

14  Emergency Food Relief Act -- not the act, but the

15  program is called the Emergency Food Relief

16  Program, and within that emergency context or

17  umbrella, if you will, it is always an emergency.

18  And to -- and USAID in the past has not --

19          THE COURT:  Is it particular to the

20  situation that exists now in Somalia?

21          MR. TRUONG:  Yes, it is, Your Honor.  So

22  Somalia is constantly under what we call food and

23  security, and then a fancy name for famine.  Or, in

24  other words, you don't know where the kitchen get

25  the next meal.

1         So that's where there is always a constant

2   emergency overarching the whole issue.

3         THE COURT:  I guess my question is, was

4   this shipping being done to specifically deal with

5   the refugee situation that now exists in Somalia?

6         MR. TRUONG:  Yes, Your Honor.  In fact, in

7   an affidavit by Ms. Denise Scherl, she said that

8   the USAID designated 2,000 tons of sorghum that are

9   going to be delivered to Somalia as emergency cargo

10   for that purpose.

11         THE COURT:  Okay.

12         MR. TRUONG:  One more thing the government

13   would like to add is that the Court does not -- one

14   thing, the Court does not have to go through this

15   tonnage calculation and rate determination

16   calculation, just look at the exemption.  We win on

17   that, on that basis alone.

18         But another basis that the Court should

19   deny the TRO on is the lack of irreparable harm.

20   The plaintiff has not shown anything to show that

21   there is irreparable injury in this case.

22         THE COURT:  Now these goods haven't been

23   shipped at this point; is that right?

24         MR. TRUONG:  As far as I know.

25         THE COURT:  Pending a decision of this

1    Court?

2           MR. TRUONG:  Actually I don't know about

3    that, Your Honor, but as far as I know, the cargo

4    is to be loaded to go to Somalia tomorrow night, 11

5    o'clock tomorrow night in Dubai, which is 3 o'clock

6    our time.

7           THE COURT:  And if I issued a ruling in

8    favor of the plaintiff, what impact would that have

9    on the shipping of those products?

10           MR. TRUONG:  Well, for one thing, the time

11   difference, the time differential is going to be

12   difficult to fax the order to whoever over in Dubai

13   who is in charge of that cargo, and maybe we have

14   to unload the cargo and have it in storage and what

15   have you.

16           THE COURT:  So you're saying that I would

17   then ultimately reach a final determination, that

18   those products would remain in storage and would

19   not be available for consumption in Somalia?

20           MR. TRUONG:  That's correct, Your Honor.

21   And that's one of the points that we make in our

22   public interest, if you will, that we should let

23   this -- let the cargo go forward to feed the people

24   of Somalia.

25           THE COURT:  Assuming for the sake of

1   argument that they ultimately prevail on the

2   merits, would they have an available remedy to them

3   in reference to having lost this particular

4   shipping business?

5           MR. TRUONG:  That's a big assumption, but

6   I'll go with your assumption, Your Honor, to the

7   extent --

8           THE COURT:  I understand.  I'm saying

9   hypothetically if they win.

10          MR. TRUONG:  Hypothetically.  Well, they

11  can continue to sue, the litigation goes forward,

12  but as far as I know, I don't think they have a

13  remedy at law.  However, the law of the circuit is

14  that even though a plaintiff may not have a remedy

15  at law, that does not constitute irreparable harm,

16  plus the fact that the business of the plaintiff

17  has to be threatened, the existence of the

18  plaintiff's business has to be threatened in order

19  to constitute irreparable harm.

20          As far as I know, from the affidavit and

21  from the complaints and what have you, the ship,

22  THUNDER AND LIGHTNING, is just waiting for another

23  job.  So, in other words, they may have temporary

24  employment, by the ship and by the crew, but

25  nothing come close to threatening the business of

1    the plaintiff.

2        And also I just wanted to refer the Court

3    to attachment A that we attached to our motion --

4    I'm sorry, our opposition where the plaintiff, same

5    exact ship, same exact vessel, brought this

6    particular case in the Washington -- western

7    district of Washington and the Court in that case

8    found no irreparable harm.  Same argument, Your

9    Honor.

10        THE COURT:  What is your response to

11    counsel's representation that there has been

12    habitual noncompliance with the Cargo Act?

13        MR. TRUONG:  Well, I don't think that is a

14    purposeful thing.  For one thing, it has to be

15    looked at on an annual basis to see what the

16    problem is or was because of the noncompliance, but

17    the way that -- and I don't know how many years

18    that the USAID has not been in compliance and I

19    don't know the percentage of noncompliance.  Are we

20    talking about 75 percent and then we talk 74

21    percent, or you know, 75 percent is the compliance

22    rate, and if you have 50 percent -- I don't know

23    what the noncompliance rate is.

24        But to answer the question directly, if we

25    have an emergency in the world somewhere, either

1    disaster relief or emergency food relief, that

2    exemption is going to be invoked, and that may cost

3    the compliance.  So we have to go back and look at

4    the whole picture to see how many times the

5    exemption has been invoked.  Hence, creating a

6    noncompliance of that 75 percent requirement.

7         THE COURT:  Would the savings that would

8    occur in this case as a result of using the foreign

9    vessel contribute to the agency's ability to

10   provide additional relief?

11        MR. TRUONG:  Absolutely, Your Honor.

12   Under the title II program where the USAID is

13   procuring or providing foods around the world, they

14   have a budget, and to the extent that the money is

15   spent on transportation, for example, then that

16   takes away from their budget to provide commodities

17   to --

18        THE COURT:  What would be the dollar

19   saving here?

20        MR. TRUONG:  I don't have the exact

21   figure, Your Honor, but to the extent that it's

22   important, I can definitely get that.

23        THE COURT:  Do your colleagues have that?

24        [Pause.]

25        MR. TRUONG:  Approximately $466,000, Your

1  Honor, on the savings.  And that's a lot of

2  sorghum, Your Honor.

3          THE COURT:  And how much sorghum are we

4  talking about as far as the dollar value in this

5  particular shipping?

6          MR. TRUONG:  I know the quantity is two

7  tons of sorghum, but I don't know the exact dollar

8  amount.  But we can get that information to the

9  Court fairly quickly, I think.

10          THE COURT:  Okay.  Anything else?

11          MR. TRUONG:  That's it, Your Honor.

12          THE COURT:  Thank you.

13          Reply?

14          MR. SHEA:  Thank you, Your Honor.

15          THE COURT:  I guess, first of all, you

16  sort of suggest that there are some requirements --

17  I'm talking to counsel -- that there are some

18  requirements that the agency has to satisfy in

19  order to invoke the emergency provision.  What are

20  those requirements and what is your authority for

21  those requirements having to be met?

22          MR. SHEA:  Well, I would say the basic

23  requirement would be notice requirement.

24          THE COURT:  Is there something in the law

25  that says that?

1      MR. SHEA:  There really isn't anything in

2  the law, Your Honor, except that, first of all,

3  they put out a solicitation seeking bids.  They

4  incorporated Cargo Preference requirements in it,

5  specifically.  They never suggested it was out of

6  the ordinary course, and that's when I suggest this

7  determination was made after they looked at the

8  rates.  And it was explicit.  There really isn't

9  anything ambiguous about this.  They say we made

10  this determination because we didn't want to pay

11  that rate.

12      THE COURT:  Does the Crowley case support

13  them being able to do that?

14      MR. SHEA:  There is no discussion in

15  Crowley as to what the prior procedure was,

16  frankly, and there is no explicit finding to that

17  effect.  At that time -- in the Crowley case, as I

18  recall, the government chartered five ships and two

19  of them were U.S. flag.  The issue was whether they

20  were required to have more U.S. flag vessels.  But

21  they were vessel charters and it was done on a

22  different kind of timeframe.

23      But there is no specific discussion in

24  there that permitted them to make that

25  determination on a post hac basis, which is

1    certainly what they have done here.

2           As for the issue about savings, Your

3    Honor, I think Your Honor focused quite correctly

4    on where -- what the direction this is going.

5    There is an allegation -- what the government has

6    done is say it's cheaper to use this foreign

7    vessel.

8           Well, that is a maxim or a proposition

9    that would swallow the whole Cargo Preference

10   program, and what they have done in this case is

11   they got the bids.  They didn't say in advance we

12   might -- this is an emergency, we might invoke

13   these emergency powers.  What they said was

14   basically they did it in the ordinary course, and

15   then after they looked at the rates -- and our

16   rates in particular -- they said, it's in -- you

17   know, we have decided that here we're going to save

18   this money.

19          In fact, there are savings as between the

20   foreign and U.S. carrier, but the program and the

21   deficit dwarfs that, absolutely dwarfs that in the

22   sense that, like I say, that the program deficit is

23   320,000 metric tons.

24          Well, 2,000 tons is really a drop in the

25   bucket for that program, and hence this is a kind

 1   of -- this is really an <u>ad hoc</u> determination.  It's

 2   not really a programmatic determination.  This is

 3   not a determination that they have so much cargo

 4   that they want to move to this destination.  In

 5   fact, there is a suggestion in the briefs that

 6   there is a specific amount that they want to move

 7   there to this particular destination.

 8        What they have done is they have said we

 9   want to save some money on this program, and we're

10   saving it on -- you know, by not using your vessel.

11   That is really, I suggest to Your Honor, that that

12   is a rate determination, not a programmatic

13   determination.  So it is improperly characterized.

14   And the rate determination belongs with the

15   Maritime Administration.

16        THE COURT:  I assume you would agree that

17   there is an emergency situation existing in Somalia

18   --

19        MR. SHEA:  Yes, Your Honor.  Yes, Your

20   Honor.

21        THE COURT:  -- in reference to the refugee

22   problem and the need for these people to be fed.

23        MR. SHEA:  No question, Your Honor, and we

24   wouldn't be here -- make no mistake, if you would,

25   please -- we wouldn't be here if we couldn't

1    represent to this Court that, first of all, we can

2    provide the service.  In fact, we could have

3    provided the -- if they had awarded this cargo to

4    ACT in the ordinary course, ordinarily they would

5    have done this two days after receiving the offers

6    -- the cargo would be being delivered tomorrow.

7    Okay.  Our ship was in the port at the time, the

8    ship they awarded to was not in the port, and I

9    don't even know that it's arrived in the port as

10   yet.  Our ship was available to start loading that

11   cargo immediately.  It could do it more efficiently

12   because it would not containerize the cargo, it

13   would carry it in pallets, and it would proceed

14   directly from Dubai to the destination port without

15   intermediate stops.

16          The ship that AID chose for this had two

17   or three intermediate stops, and while they do have

18   a schedule to maintain, there is nothing to

19   guarantee that there won't be delays in some of

20   these other ports.

21          So, again, Your Honor, we wouldn't be here

22   if we couldn't represent to you that we could do it

23   promptly and, in fact, we could do it faster than

24   the vessel that AID assigned.

25          THE COURT:  Is there any conflict between

1    the cargo legislation and the legislation regarding

2    providing emergency food relief?

3          MR. SHEA:  Yes.  Yes, Your Honor.  In

4    fact, when the amendments that they refer to were

5    passed by Congress in the legislative history, the

6    legislative history said AID should have this

7    authority, but it is not intended to derogate from

8    the requirements of the Cargo Preference Act.  And

9    I can furnish you that now, if that might assist

10   you.

11         THE COURT:  Because I would assume,

12   considering the famine that's taking place

13   throughout many parts of this world, that clearly

14   USAID does not have the amount of money that it

15   needs in order to satisfy the hunger problem that

16   exists.

17         MR. SHEA:  There are many competing

18   demands for USAID, Your Honor, and --

19         THE COURT:  And in reference to providing

20   food assistance, I assume you would have to agree

21   that they don't have the money to solve the problem

22   of hunger in the world.

23         MR. SHEA:  I don't know that anybody has

24   the  money for that, Your Honor, so I will readily

25   and happily concede that to Your Honor.

1    THE COURT:  But to the extent that they
2  have agreement greater amount of money because they
3  don't have to use it for cargo, I would assume you
4  would have to agree that that would mean that more
5  mouths could be fed.
6    MR. SHEA:  Your Honor, that assumes a
7  budgetary -- that if they had more money in their
8  budget, what else would they do with it.  I don't
9  really know.  They might find other budgetary
10  priorities.  So I don't know that I can answer that
11  specifically.  But I suppose to the extent they
12  recognize savings, certainly, and to the extent
13  that they allocated those savings to a purchase of
14  commodities, you are right.  And there is tension.
15    And as I say, when these amendments were
16  adopted by Congress, there was a statement of
17  legislative intent that they were not intended to
18  derogate from the requirements of Cargo Preference.
19  And I would be happy to furnish that to you.
20    THE COURT:  Give it to my clerk and I will
21  make a ruling.
22    THE DEPUTY CLERK:  Remain seated.
23    [Recess.]
24    THE COURT:  Mr. Shea, there was one
25  question I had forgotten to ask you, and that was

1   the question of irreparable harm, and how have you

2   shown that your client would suffer irreparable

3   harm.  Counsel indicates that, and it is correct in

4   this circuit, that merely showing economic injury

5   and the lack of a legal remedy to address it is not

6   adequate to show irreparable harm.

7           MR. SHEA:  I understand, Your Honor.  This

8   ship has been in this port really looking for cargo

9   and available to carry this in the first --

10   perfectly positioned to carry this particular cargo

11   for three weeks -- actually, a little more than

12   three weeks, I think, as we speak.

13           From a practical point of view, as they

14   approach -- when they get to a month, there is no

15   reason to keep that ship -- first of all, to keep

16   the ship manned and crewed.  They are going to have

17   to basically lay it up somewhere.  There is no

18   cargo for that vessel on the horizon as we speak.

19   They will have to lay it up, discharge the crew,

20   they'll find a location and they'll lay it up, but

21   they can't lay it up in Dubai.  The port, I think,

22   is too busy and too crowded, so they will have to

23   move it somewhere else.

24           And frankly, at that point, one of the

25   reasons why it was there is to carry military and

1    civilian cargo.  If there is no reason -- and this

2    is not -- this ship becomes an unviable project

3    without this type of cargo.  And the question

4    propounded by the government is, well, what's too

5    far, what's -- you know, if you get taken care of

6    in another month, is that okay.

7          The practical side of it from -- and it's

8    hard to define where exactly that is, but this ship

9    is approaching the point of no end, certainly

10    beyond a month.  It has no business being there, it

11    has no business being crewed, and it may well have

12    no business being in the U.S. flag.  That's the

13    practical judgment they're going to make.  The one-

14    month threshold is pretty much it, and we have

15    submitted an affidavit to that effect.

16          THE COURT:  How many ships does your

17    client's company have?

18          MR. SHEA:  Frankly, at this point, Your

19    Honor, I -- may I ask for assistance of my

20    colleague?

21          [Pause.]

22          MR. SHEA:  This really is a stand-alone

23    enterprise.  They have five other vessels that are

24    run by this company -- forgive me, four other

25    vessels that are operated by this company.  This is

1   really a stand-alone enterprise, and this feature

2   of the enterprise frankly is likely to -- is

3   unsustainable with this kind of scenario because

4   the cargo base for the military and the preference

5   cargo base just is -- this is a circumstance where

6   you don't know really what's there.  If the

7   government doesn't like the rate, they say, well,

8   we're going to play this trump card and there's no

9   reason to have this ship in the U.S. flag, or

10   certainly anywhere near Dubai.

11            THE COURT:  Okay.  Thank you.

12            Obviously the standard for obtaining

13   emergency relief by way of a temporary restraining

14   order is a stringent standard for obvious good

15   reasons, and the four-part test that I have to

16   apply controls, and also in the context of a

17   decision made by an agency.  Obviously that agency

18   decision is entitled to deference by the Court, and

19   there is a presumption in the law in the favor of

20   the validity of administrative action.

21            Here as acknowledged by plaintiff's

22   counsel, there is no legal requirement that can be

23   cited to me as authority for the proposition that

24   at the time a request for bids is made that there

25   be an invocation at the time of the potential that

1   the emergency provision will in fact be invoked.

2   And I think there is obvious good reason for that.

3   The fact that no such authority exists, I think,

4   suggests that obviously there is no such

5   requirement.  Because I conclude that I can't as a

6   judge read that requirement into the law absent

7   some legal authority that would give me the right

8   to do that.

9        So I would conclude that there was no

10  violation committed by the agency by not, when it

11  made the notice of the bids, that there was no

12  violation when they did not indicate that

13  conceivably this provision would be invoked.

14       I think it is clear that in reference to

15  the Somalia situation that there is a disaster

16  situation in existence, and that clearly food

17  materials are needed in that country in order to

18  save lives, and obviously money means greater

19  product capability, and I don't know, obviously, as

20  counsel indicates, that the savings will in fact be

21  used, but I'm not in a position to second-guess the

22  agency's decision considering the realities of the

23  circumstances regarding whether this is in fact an

24  emergency circumstance.  And it seems to me, and I

25  agree with government counsel, that if a

1    determination, a proper determination has been made

2    by the agency that an emergency circumstance exists

3    and therefore the section 1772(a) of title VII can

4    be invoked, that it seems to me they have made an

5    appropriate decision considering the realities of

6    the circumstance that an emergency does exist, and

7    therefore this provision applies.  And I agree with

8    the government's decision -- representations or

9    position that once that determination is

10   appropriately made, that the products that are

11   being shipped pursuant to that emergency do not

12   calculate into the cargo legislation percentage

13   requirement.

14            I would therefore conclude that they have

15   shown that there is not substantial likelihood of

16   success on the merits, and also would conclude,

17   most importantly, since the hallmark of emergency

18   injunctive relief is irreparable harm, that there

19   has not here been a showing of irreparable harm in

20   light of the fact that this is one of five ships,

21   there is no indication that this company will not

22   be able to continue to function if they don't

23   receive the bid in reference to this particular

24   shipping.

25            I think in addition to those two factors,

1   obviously it seems to me that there is a public

2   interest for the Somalian refugees to receive food

3   materials because obviously·lives will be saved if

4   they receive those items, and if I were to grant

5   the injunctive relief, the end result would be that

6   these products would have to remain in storage

7   until a final decision is made, and obviously that

8   decision would impair the ability to feed people

9   who obviously are in desperate need of food

10   materials in order to remain alive.

11        Also I think that the injury to the

12   government, if they were unable to make the

13   shipping, far outweighs the injury that the

14   plaintiff would suffer because obviously it seems

15   to me that there is an interest on the part of the

16   United States from an international perspective to

17   provide food materials in Somalia, considering the

18   issue that that engenders in the world community,

19   and I would therefore have to conclude that based

20   upon the four factors I have to consider -- the

21   other considerations when we are talking about an

22   agency decision, that the showing necessary to

23   justify the issuance of a temporary restraining

24   order has not been satisfied, and therefore I have

25   to deny the motion before the Court to issue that

1    relief at this time.

2         I guess what we need to do now is to set a

3    briefing schedule for the filing of additional

4    papers with the Court.

5         Anything else?

6         MR. TRUONG:  No, Your Honor.

7         THE COURT:  Very well.  I assume -- how

8    much time would plaintiff's counsel need to -- I

9    guess it would be the government, I assume, who

10   would be initiating the filing of additional papers

11   in this case?

12        MR. TRUONG:  Thirty days, Your Honor.

13   Would that be too long?

14        THE COURT:  Very well.  That would take us

15   to the 26th of August.

16        MR. TRUONG:  I'm sorry, Your Honor, can we

17   do it after that, because I actually have plans to

18   be out of town the 26th of August, and --

19        THE COURT:  Can counsel cancel -- I'm just

20   joking with you.  When do you plan to be away?

21        MR. TRUONG:  The 25th through -- following

22   that weekend.  I don't know the dates, but through

23   the weekend.

24        THE COURT:  So the 28th, 29th, something

25   like that?

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

1          MR. TRUONG:  Yes, sir.

2          THE COURT:  Very well, the 2nd of

3  September.

4          MR. TRUONG:  That will be fine, Your

5  Honor.

6          THE COURT:  And how much time would

7  plaintiff's counsel to file an opposition?

8          MR. SHEA:  Your Honor, we could file an

9  opposition in three weeks.

10         THE COURT:  Very well, the 23rd of

11  September, and then the government would need to

12  file its reply by the 3rd of October.

13         MR. TRUONG:  That's fine, Your Honor.

14         THE COURT:  And -- very well, I will set a

15  hearing date and try and be in a position to make a

16  ruling from the bench.  The 7th of October for a

17  hearing, if that's good for counsel, 9:45.  Is that

18  good?

19         MR. TRUONG:  Yes, Your Honor.

20  Clarification, Your Honor.  Is that to argue the

21  motion or just a status hearing?

22         THE COURT:  To argue the motion.

23         MR. TRUONG:  Thank you.

24         MR. SHEA:  Very well, Your Honor.

25         THE COURT:  Thank you.  We'll see you

ar                                                                                          34

1   then.

2            [Whereupon, at 4:10 p.m., the hearing was

3   concluded.]

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

# CERTIFICATE

I, **JON HUNDLEY**, the Official Court Reporter for Miller Reporting Company, Inc., hereby certify that I recorded the foregoing proceedings; that the proceedings have been reduced to typewriting by me, or under my direction and that the foregoing transcript is a correct and accurate record of the proceedings to the best of my knowledge, ability and belief.

*Jon Hndly*

JON HUNDLEY