# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>AMERICAN CARGO TRANSPORT, )<br>INC., )<br> )<br>      Plaintiff, )<br> )<br>   v. )<br> )<br>ANDREW S. NATSIOS, UNITED )<br>STATES AGENCY FOR )<br>INTERNATIONAL DEVELOPMENT, )<br>and JOHN JAMIAN, ACTING )<br>DIRECTOR, DEPARTMENT OF )<br>TRANSPORTATION, )<br> )<br>      Defendants. )<br>_____) | Civil Action No. 05-1452 (RBW) |

## <u>MEMORANDUM OPINION</u>

On July 22, 2005, the plaintiff, American Cargo Transport, Inc. ("ACT"), filed this action to challenge a decision of the United States Agency for International Development ("USAID"). Complaint ("Compl.") ¶ 23. The USAID's decision, made on or about July 13, 2005, awarded a contract for the oceanic shipment of 2,009 metric tons of sorghum from Dubai, UAE to Mombosa, Kenya, by a non-United States ("U.S.")-flag ship. Compl. ¶ 15. ACT, a bidder for this contract and a U.S.-flag ship enterprise, contends that the USAID's contract award to a non-U.S.-flag ship was an arbitrary and capricious override of the Cargo Preference Act of 1954 ("CPA"), 46 U.S.C. app. § 1241 <u>et seq.</u> (2000), in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 201 <u>et seq.</u> (2000), and therefore, should be set aside. Compl. ¶¶ 23, 25; Pl.'s Mot. for Summary Judgment ("Pl.'s Mot.") 4. Currently before the Court are the parties'

cross-motions for summary judgment.[1]  For the reasons that follow, the Court grants the

defendants' motion for summary judgment and denies the plaintiff's cross-motion for summary

judgment.

## I.    Background

### (A)    Statutory Background

The CPA regulates, among other things, the shipment of materials or commodities for the

benefit of other countries.  46 U.S.C. app. § 1241.  Under the CPA, Congress established a

preference for shipping such cargo on U.S.-flag vessels.  Id.  Specifically, the CPA states:

> Whenever the United States shall . . . furnish to or for the account of any foreign nation
> without provision for reimbursement, any equipment, materials, or commodities, within
> or without the United States, . . . the appropriate agency or agencies shall take such steps
> as may be necessary and practicable to assure that at least 50 per centum of the gross
> tonnage of such equipment, materials, or commodities, . . . which may be transported on
> ocean vessels shall be transported on privately owned United States-flag commercial
> vessels, to the extent such vessels are available at fair and reasonable rates for United
> States-flag commercial vessels, in such manner as will insure a fair and reasonable
> participation of United States-flag commercial vessels in such cargoes by geographic
> areas.

Id. § 1241(b)(1) (emphasis added).  Shipments of agricultural commodities are further regulated

by § 1241f(a)(1), which provides that, in addition to the preferences set forth in § 1241(b)(1),

another "25 percent of the gross tonnage of agricultural commodities or the products thereof . . .

---

[1]  The following papers have been submitted in connection with these motions: (1) Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."); (2) Defendants' Statement of Material Facts for Which There Is No Genuine Dispute ("Defs.' Stmt."); (3) Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."); (4) Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue ("Pl.'s Stmt."); (5) Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Opp'n"); (6) Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"); (7) Plaintiff's Response to Defendants' Statement of Material Facts as to Which There In [sic] No Genuine Dispute; (8) Defendants' Response to Plaintiff's Statement of Material Facts as to Which There is no Genuine Issue; (9) Defendants' Reply in Support of Defendants' Motion for Summary Judgment ("Defs.' Reply"); (10) Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Pl.'s Reply").  Because both sets of papers raise arguments that are substantially identical, the Court will primarily cite to the papers submitted in connection with the plaintiff's summary judgment motion.

shall be transported on United States-flag commercial vessels." Id. § 1241f(a)(1). Taken

together, these regulations assure that at least seventy-five percent of agricultural commodities

procured by the United States are transported on U.S.-flag vessels. See id. §§ 1241(b)(1),

1241f(a)(1). The Maritime Administration ("MARAD"), a division of the United States

Department of Transportation, is charged with ensuring compliance with the CPA. See 46

C.F.R. §§ 381.1-382.4 (2006). And under regulations promulgated by the MARAD, "[e]ach

department or agency having responsibility under the [CPA]" must satisfy their requirements

under the CPA before using foreign-flag carriers.[2] Id. § 381.5. These regulations also

established a formula to calculate what a "fair and reasonable rate" is for U.S.-flag vessels under

the CPA, § 382.3, and clarify that the CPA need not be utilized when "U.S. flag vessels are not

available at fair and reasonable rates," or "there is a substantially valid reason for fixing foreign-

flag vessels first," § 381.5.

      Title II of the Agricultural Trade Development and Assistance Act of 1954, 7 U.S.C.

§ 1691 et seq. (2000) ("Title II"), seeks to use "abundant agricultural productivity to promote the

foreign policy of the United States by enhancing food security of the developing world." 7

U.S.C. § 1691. The USAID is charged with administering the humanitarian aid programs under

Title II, 7 U.S.C. § 1721, and through these programs the USAID provides both emergency and

non-emergency agricultural assistance to foreign countries, 7 U.S.C. § 1722(a)-(b). Agricultural

food programs under Title II are subject to the CPA's U.S.-flag ship requirements. See 46

U.S.C. app. §§ 1241(b)(1), 1241f(a)(1). However, when emergency assistance is being supplied,

it may be provided "[n]otwithstanding any other provision of law." 7 U.S.C. § 1722(a). Thus,

---

[2] However, several exceptions to this requirement exist. See, e.g., 46 C.F.R. § 381.5 ("[E]xcept[ions exist] where such department or agency determines, with the concurrence of the Maritime Administration, that (a) U.S.- flag vessels are not available at fair and reasonable rates for U.S.-flag commercial vessels, or (b) that there is a substantially valid reason for fixing foreign-flag vessels first.").

when emergency assistance is being provided under § 1722(a), the USAID need not comply with the shipping requirements of the CPA.  See id.

**(B)    Factual Background**

The Food For Peace program ("FFP") is a Title II program administered by the USAID. Defs.' Mem., Ex. A at 2 (Declaration of Denise Scherl, Chief, Transp. Div., Office of Acquisition and Assistance, USAID ("Scherl Decl.")).  On June 9, 2005, the USAID approved emergency food aid for south central Somalia through this program.  Administrative Record ("Admin. R.") at 27-28.  This plan called for cooperation with a non-profit organization, the Cooperative for American Relief Everywhere ("CARE"), to distribute a total of 24,240 metric tons of sorghum, lentils, vegetable oil, and corn soy blend to the region.  Admin. R. at 27-31. The USAID cooperates with CARE by providing Title II grants authorized under 7 U.S.C. § 1722(d)-(e).  Admin. R. at 27-28.

On July 11, 2005, the CARE issued a solicitation for the oceanic transport of approximately 2,009 metric tons of sorghum from Dubai, United Arab Emirates, to Mombasa, Kenya.  Id. at 12-13.  This sorghum was ultimately destined for distribution in Somalia under the FPP Title II program.  Id. at 12.  In response to the July 11, 2005, solicitation, ACT and other ocean carriers submitted proposals to transport the sorghum.  Id. at 14-24.  The ACT's bid was for its U.S.-flag vessel, the Thunder/Lightning, to transport the sorghum at the price of $298 per metric ton, with a departure date from Dubai on July 20, 2005, and an arrival date in Mombasa on July 29 or 30, 2005.  Id. at 22.

On July 19, 2005, seven days after the proposals were submitted, the USAID awarded the sorghum contract to the lowest bidder, Global Container Lines ("GCL").  Id. at 25. GCL's bid was for its foreign-flag vessel, departing Dubai on July 23, 2005 and arriving in Mombasa on

4

August 7, 2005, to transport the sorghum at the rate of $65 per metric ton.  Id. at 20.  In awarding

the contract to a non-U.S.-flag vessel, the USAID relied on the emergency assistance provision

of 7 U.S.C. § 1722(a) to bypass the preference given to U.S.-flag ships by the CPA.  Id. at 6-8.

According to the government, the USAID selected a foreign-flag ship to deliver the cargo

because the difference in cost between the lowest bid for the services of a U.S.-flag ship was

$233 per metric ton greater than the offer made by GCL.  Thus, paying for the service of a U.S.-

flag ship would significantly impact the USAID's ability to fulfill the objectives of the FFP

program to "alleviate human suffering in the region [during the 2005] fiscal year."  Id.; Defs.'

Mem. at 4.  Moreover, the USAID stated that it "considered the benefit of [the p]laintiff's offer

to deliver the sorghum to Somalia seven days earlier against the savings gained from using a

foreign-flagged vessel, and decided that the benefit does not outweigh the 'overall harm to the

future of the program by paying [the plaintiff's] exorbitant rates.'"  Id. (quoting Scherl Decl. at

4.).

        ACT objected to the USAID's decision to award the contract to GCL and sought

reconsideration of that decision.  Admin. R. at 85-86.  In addition, ACT initiated an internal

grievance procedure through the MARAD pursuant to 46 C.F.R. § 381.6.  Id. at 88-89.  After

reviewing ACT's grievance, the MARAD determined that the USAID had not complied with the

CPA when it awarded the contract to GLC.  Id. at 91, 97-98.  Notwithstanding ACT's objection

and the MARAD's determination, the USAID refused to alter its decision to award the contract

to GCL. Id. at 88.

        On July 22, 2005, ACT commenced this action challenging the USAID's decision to

award the sorghum contract to GCL.  The plaintiff contemporaneously filed a motion for a

temporary restraining order and a motion for a preliminary injunction.  The Court heard

arguments on the plaintiff's motions on July 26, 2005.  At the conclusion of the hearing, the

Court orally denied the plaintiff's motions.  The shipment of sorghum that is at issue in this case

departed for Dubai on July 27, 2005, and arrived in Mombasa on August 7, 2005.  Defs.' Mem.

11.

## II.    The Parties' Arguments

The plaintiff's central argument is that the USAID's decision to invoke the emergency

assistance provision of 7 U.S.C. § 1722(a) (2000) and bypass the requirements of the CPA, was

arbitrary and capricious under the APA.  Pl.'s Mem. at 1.  The plaintiff relies on several

omissions in the USAID's decision making process to support this argument.  Id. at 14-17.  First,

the plaintiff opines that the decision was erroneous because the USAID failed to determine

whether ACT's freight rate was "unfair or unreasonable" under the applicable CPA regulation,

46 C.F.R. § 382.3. Pl.'s Mem. at 14.  In fact, the plaintiff notes that the MARAD determined that

a fair and reasonable price would have been $300.31 per metric ton, a price higher than ACT's

bid of $298 per metric ton.  Id. at 9; see also Admin. R. at 100-101 (showing the MARAD's

calculations).   Second, the plaintiff challenges the USAID's articulated reason for applying the

emergency assistance provision of § 1722(a)—that it intended to save money to further the FFP

program's ability to provide future agricultural aid to the region—because the USAID would

have been reimbursed for any additional costs of using a U.S-flag ship.[3]  Pl.'s Mem. at 15. Third,

the plaintiff argues that the USAID acted in error by failing to consider that as of July 2005, it

was not on target to meet its seventy-five percent requirement under the CPA before the end of

the Title II program year on September 30.  Id. at 11.  Furthermore, the plaintiff believes that the

---

[3]  Under 46 U.S.C. app. § 1241(h), the Secretary of Transportation is required to finance an agency's increased costs
that result from shipping agricultural commodities on U.S.-flag ships pursuant to Title II.

USAID's decision was arbitrary and capricious because it was made after its solicitation and review of the submitted bids. Pl.'s Opp'n at 4-5. Finally, the plaintiff argues that no signatory to the USAID's decision to invoke the emergency assistance provision had the authority to make such a determination and thus the USAID's decision to award the sorghum contract to GCL is invalid. Pl.'s Mem. at 11.

The government argues, however, that the USAID's decision was not arbitrary or capricious and thus there is no basis to set aside the USAID's decision under the APA. Defs.' Mem. at 7. Rather, the government maintains that the USAID has "complete discretion" to invoke the emergency assistance provision of 7 U.S.C. § 1722(a) and this Court should therefore not overturn the USAID's decision. Defs.' Opp'n at 7. Moreover, the government argues that the USAID's decision "to save money and conserve the resources to fund programs that alleviate human suffering" was a proper use of its discretion. Id. at 7-8. The government also contends that under internal USAID policy—its Automated Directives System ("ADS")—the director of the FFP program has the authority to implement emergency Title II efforts and that the decision here was properly authorized by the director. Defs.' Opp'n at 6. Finally, the government argues that since the sorghum at issue has already been delivered by GCL, this action should be dismissed as moot.[4] Defs.' Mem. 11-12.

---

[4] The defendants' mootness argument is meritless and warrants little discussion. It is well settled that:

> The mootness doctrine limits federal courts to deciding "actual, ongoing controversies." "Even where the litigation poses a live controversy when filed, the doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."

Lepelletier v. FDIC, 23 F. App'x. 4, 6 (D.C. Cir. 2001) (quoting Honig v. Doe, 484 U.S. 305, 317 (1988); Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990)). However, a court will not apply the mootness doctrine and dismiss a case if the challenged action is capable of repetition but is evading judicial review. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 191 (2000). This exception to the mootness doctrine has the following two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same

(continued...)

### III.    Standard of Review

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party. Bayer v. United States Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992). However, the non-moving party cannot rely on "mere allegations or denials . . . , but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted). Under Rule 56, "if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial" summary judgment is warranted. Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). The party moving for summary judgment bears the burden of establishing the absence of evidence to support the non-moving party's case. Id. In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citations omitted). Additionally, "in ruling on cross-

---

(...continued)

action again." Weinstein v. Bradford, 423 U.S. 147, 149 (1975).

       Here, both prongs of the this test are satisfied. First, it is undisputed that the events underlying this action were clearly too short in duration to afford the plaintiff the opportunity to fully litigate its claims because the sorghum was shipped only one day after the Court ruled on the plaintiff's motion for emergency injunctive relief and before the Court had even been provided with the administrative record. Defs.' Mem. at 11. Moreover, contrary to the government's argument, there is a reasonable expectation that the parties here will be forced to litigate the same issues again. In fact, fatal to the defendants' argument is its own reference to a prior litigation, occurring only four months before this action was commenced, which involved the same legal issues and the same parties. Defs.' Mem. at 5n.4. Accordingly, the defendants' mootness argument is without merit.

motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." Petchem, Inc. v. United States, 99 F. Supp. 2d 50, 54 (D.D.C. 2000) (citations omitted).

## IV.    Legal Analysis

This action ultimately hinges on the validity of an agency decision made in administering a Title II program that the agency concluded overrode the CPA. Like most administrative agency decisions, the one at issue here is subject to the APA. Sloan v. HUD, 231 F.3d 10 (D.C. Cir. 2000); A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484 (D.C. Cir. 1995); Associated Metals and Minerals Corp. v. Carmen, 704 F2d 629 (D.C. Cir. 1983). Judicial review under the APA is applicable for any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (2000). However, the scope of the review permitted under the APA is limited, and the Court can only set aside an agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. § 706.

The Court notes at the outset that it cannot accept the defendants' position that their actions are not reviewable by this Court because the agency action "is committed to agency discretion by law." Defs.' Opp'n at 2-5 (citing 5 U.S.C. § 701(a)(2)). The Supreme Court has acknowledged that under § 701(a)(2)

> review is not to be had in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ('law') can be taken to have committed the decisionmaking to the agency's judgment absolutely.

Lincoln v. Vigil, 508 U.S. 182, 191 (1993) (citations and internal quotations omitted); see

Heckler v. Chaney, 470 U.S. 821, 830 (1985).  Although the emergency assistance provision of

§ 1722(a) does grant broad discretion to the USAID, this Court finds that a meaningful standard

exists upon which to base an APA review of the plaintiff's § 1722(a) challenge.  The challenge is

predicated on the government's failure to award a contract to the plaintiff and whether the reason

for the denial violated the APA.  Under the law that governs procurement decisions, a

"[d]issappointed bidders may challenge a government contract award under the [APA]."  Iceland

Steamship Co. v. United States Dep't of the Army, 201 F.3d 451, 453 (D.C. Cir. 2000); accord

Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859, 874 (D.C. Cir. 1970) (citing Raoul Berger,

Administrative Arbitrariness: A Synthesis, 78 Yale L.J. 965 (1969)); see also B.K. Instrument,

Inc. v. United States, 715, F.2d 713, 718 (2d Cir. 1983); Kinnett Dairies, Inc. v. Farrow, 580

F.2d 1260, 1265-66 (5th Cir. 1978); Hayes Int'l Corp. v. McLucas, 509 F.2d 247, 256 (5th Cir.

1975); Armstrong & Armstrong, Inc. v. United States, 514 F.2d 402, 403 (9th Cir. 1975);  Airco,

Inc. v. Energy Research & Dev. Admin.,  528 F.2d 1294, 1296 (7th Cir. 1975); Merriam v.

Kunzig, 476 F.2d 1233, 1242 (3d Cir. 1973); William F. Wilke, Inc. V. Dep't of the Army, 485

F.2d 180, 183 (4th Cir. 1973).  But cf. Window Sys., Inc. v. Manchester Mem'l Hosp., 424 F.

Supp. 331, 336 (D. Conn. 1976) (finding APA review inappropriate where the contracting

institution's relationship to the federal government was too attenuated).  And with regard to

government contracts generally, this Circuit has made clear that "the ultimate standard 'is

whether the Government's conduct was arbitrary and capricious toward the bidder-claimant.'"

Old Dominion Dairy Prods., Inc. v. Sec'y of Def., 631 F.2d 953, 960 (D.C. Cir. 1980) (quoting

Keco Indus., Inc. v. United States, 492 F.2d 1200, 1203 (Cl. Ct. 1974)).  Thus, while the

USAID's decision to invoke the emergency assistance provision goes to the ultimate question of

whether the agency's decision to award the contract to GCL violated the APA, the case boils down simply to one involving the awarding of a contract. Accordingly, cases that have reviewed the awarding of other government contracts provide guidance as to the proper standard to employ when reviewing USAID decisions under Title II.[5] Id. Thus, this is not one of the rare situations where judicial review is proscribed by 5 U.S.C. § 701(a)(2). See, e.g., Lincoln, 508 U.S. at 190; Heckler, 470 U.S. at 830; Webster v. Doe, 486 U.S. 592, 599-600 (1988); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971).

This Court must determine whether the decision to award the contract to GCL violated the APA. For the reasons that follow, it is clear that it did not. The decision to award the contract to GCL was based upon the defendant's decision to apply the emergency assistance provision of § 1722(a). Thus, for the plaintiff to prevail, this Court must be able to conclude that employing this provision was "arbitrary and capricious." Petchem, Inc. v. United States, 99 F. Supp. 2d 50, 54 (D.D.C. 2000). The plaintiff carries the "heavy burden" of satisfying this requirement. GE Gov't Servs., Inc. v. United States, 788 F. Supp. 581, 590 (D.D.C. 1992). Moreover, the APA arbitrary and capricious standard of review is narrow in scope and does not permit this Court to substitute its own judgment for that of the USAID. Chamber of Commerce of the United States v. SEC, 412 F.3d 133, 140 (D.C. Cir. 2005) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

---

[5] The APA standard of review employed in Rainbow Navigation, Inc. v. Dep't of the Navy, 783 F.2d 1072, 1080 (D.C. Cir.1986), is not applicable here. There, the Court held that a Department of the Navy decision to depart from the CPA requirements was reviewable under the "standard of reasonable profit." Id. at 1080. The Court employed this standard of review because it assumed that the agency justified its decision on "an independent economic determination," id. at 1078, of what were "fair and reasonable" rates under 48 C.F.R. § 47.502(a)(1). Id. However, the USAID's decision here is predicated on an emergency food crisis under 7 U.S.C. § 1722(a), which is distinct from the underlying economic rationale provided by the agency in Rainbow. Accordingly, this case warrants application of a different APA standard.

The Commodity Request associated with the sustenance aid at issue in this case clearly indicates that the planned FFP food distribution effort in Somalia was given emergency status as early as June 6, 2005.  Defs.' Opp'n, Ex. A (Commodity Request).  ACT did not submit its bid for carriage of the sorghum until July 13, 2005, well after the food emergency was declared. Admin. R. at 22.  On the basis of this record, the Court rejects the plaintiff's contentions that the award of the contract to GCL to transport the sorghum was arbitrary and capricious, and only retroactively designated as an emergency.  Indeed, this Court is hardly in a position to say that the food needs of a poor and developing nation such as Somalia do not constitute an emergency. Instead, the agency's expertise in such matters is extensive and nothing has been presented in this case to dissuade the court from according deference to the USAID's decision to provide the emergency food assistance.  See State Farm, 463 U.S. at 43.  Moreover, the Court discerns no bad faith in the USAID's logic that saving $233 per metric ton would contribute to its ability to provide additional agricultural aid to the region.  For example, that savings could be used to ship roughly 5.5 additional metric tons of sorghum at GCL's rates, and while this represents a fraction of the total food disbursement planed for Somalia (24,240 metric tons), this is not an insignificant amount of food.  The plain language of the emergency assistance provision of 7 U.S.C. § 1722(a) does not require consideration of any specific factors before the provision is invoked.  Rather, the statute merely requires that an emergency food crisis exist.  See 7 U.S.C. § 1722(a).  Accordingly, given the USAID's early declaration of a food emergency in Somalia and its expressed intention in invoking § 1722(a), which comports with the food security goals of Title II, the USAID's decision was neither arbitrary nor capricious and this Court has no basis for setting it aside.  See 5 U.S.C. § 706(2); Old Dominion, 631 F.2d at 960.

Having found that the defendants properly invoked § 1722, this Court now turns to the question of whether a valid use of the provision supersedes the requirements of the CPA.  It does.  In <u>Crowley Caribbean Transport, Inc. v. United States</u>,  865 F.2d 1281 (D.C. Cir. 1989), the District of Columbia Circuit was presented with a provision in the Foreign Assistance Act of 1961 ("FAA"), which is similar to the emergency provision at issue here.  There, the Circuit Court concluded that when the international disaster relief provision of the FAA is properly invoked, the government is completely exempt from the mandates of the CPA.  <u>Id.</u> at 1283.   The holding in <u>Crowley</u> has equal application here.  The operative language in § 491 of the FAA and § 1722(a) of Title II is equally broad and nearly identical such that "no 'clearly expressed legislative intention to the contrary'" is presented.  <u>See id.</u> (quoting <u>Consumer Product Safety Comm'n v. GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980)).  Accordingly, the USAID's proper utilization of § 1722(a) completely exempted its decision from CPA compliance.[6]

## V.    Conclusion

Based on the foregoing, the defendants did not violate the APA either when it invoked § 1722(a) or when it failed to comply with the CPA after invoking § 1722(a).  Accordingly, the defendants' motion for summary judgment is granted and the plaintiff's motion is denied.

---

[6]  The plaintiff's argument that the USAID's decision was not validly signed is also without merit.  The USAID has internally delegated "[a]ll food aid authorities and functions, including the administration, approval, and implementation of programs under Title[] II . . . ." to the Director of the FFP program.  Defs.' Opp'n, Ex. B (ADS) § 103.3.15.3(a).  Specifically the "[a]uthorities delegated to the Director of FFP hereunder include, without limitation, the authority to . . . carry out emergency and non-emergency [] Title II programs."  <u>Id.</u>  This memorandum memorializing the USAID's decision to award the sorghum contract to GCL and the underlying rationale was issued by Lauren Landis, the director of the FPP program.  Admin. R. at 7.  Accordingly, since the USAID's decision memorandum was issued by the director of the FPP program, who had been delegated the authority to exercise Title II emergency powers, the decision was procedurally valid.

Also, the defendants advance the argument that irrespective the disposition of their summary judgment motion, the Court should still dismiss the MARAD under Fed. R. Civ. P. 12(b)(6) because the plaintiff has failed to state a viable claim against it.  Defs.'s Mem. at 10 n.6.  While it is true that the plaintiff's Complaint primarily deals with the USAID's actions and not those of the MIRAD, summary judgment is granted in favor of both defendants, and thus, the Court need not reach the Rule 12(b)(6) challenge.

So **ORDERED** this 19th day of April, 2006.[7]


                              REGGIE B. WALTON
                              United States District Judge

---

[7] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.